## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **ERIC DWAYNE THOMPSON,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:23-CV-2056-L** |
| | § | |
| **CITY OF DALLAS, IVORY R. DODSON,** | § | |
| **THOMAS GUERRERO, TERRENCE J.** | § | |
| **FOREST, DINA M. RODRIGUEZ, AND** | § | |
| **BRIAN J. HARTGER,** | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

COMES NOW**,** Plaintiff, Eric Dwayne Thompson ("Mr. Thompson" or "Plaintiff"), by and through undersigned counsel, and files this Original Complaint against Defendants, City of Dallas, as well as Dallas Police Department's Officers Ivory R. Dodson ("Dodson"), Thomas Guerrero ("Guerrero"), and Brian J. Hartger ("Hartger") (collectively "Defendants"); related to injuries and civil rights violations against Plaintiff, and for cause of action shows as follows:

## NATURE OF THE ACTION

1.      This is a civil action arising under the United States Constitution, particularly under the provisions of the Due Process Clause and Fourth Amendment of the United States Constitution, and under federal law and in violation of his civil rights pursuant to 42 U.S.C. § 1983. Plaintiff is seeking damages against Defendants for a pattern of police misconduct resulting in wrongful arrest and malicious prosecution of Plaintiff, under the color of law, with the intent and for the

purpose of depriving Eric Dwayne Thompson of rights secured under the Constitution and laws of the United States.

2.      Plaintiff alleges that Defendant City of Dallas and its Policymakers, specifically the Dallas City Counsel, Mayor Eric Johnson, and Chief of Police Eddie Dodson (collectively "Policymakers") failed to properly train, supervise, screen, discipline, transfer, counsel, or otherwise control officers who are known, or who should have been known to engage in criminal investigations without reasonable suspicion and/or false arrest including those officers repeatedly accused of such acts. Policymakers had a duty, but failed to implement and/or enforce policies, practices, and procedures for the Defendants that respected Plaintiff's constitutional rights. Defendant City of Dallas and the Policymakers failed to adequately supervise and discipline officers, implement the necessary policies and implementation of unconstitutional policies caused Plaintiff's unwarranted damages. Defendant City of Dallas' officers consciously disregarded the rights of Plaintiff, knowing that the Policymakers would approve and/or ratify their actions.

3.      Specifically, on August 13, 2021, at approximately 11:40 a.m., Plaintiff was a passenger in a 2004 silver Taurus (Texas plate #MLC7245; VIN# 1FAFP52264A191303) ("vehicle"), being driven by Kendra James ("James"). Defendants Dodson and Guerrero executed a traffic stop on the vehicle for making an improper wide right turn and expired registration. Defendant Guerrero immediately approached the passenger side of the vehicle and began asking Plaintiff questions about his identity.

4.      In the meantime, Defendant Dodson was speaking to James regarding the alleged traffic offense. Defendant Dodson explained that the registration on the vehicle was expired and requested to know the reason for the same. James provided Defendant Dodson with proof of

insurance and her identification card. All the while, Plaintiff continued to advise Defendant Guerrero that he did not want to answer any questions and did not consent to Defendant Guerrero's investigation. Defendant Dodson then turned her attention from investigating the traffic stop and focused her attention on obtaining Plaintiff's name. Plaintiff refused to provide the same to Defendant Dodson as well.

5.      Defendants Dodson and Guerrero's questioning then led to the investigative stop lasted longer than necessary to effect the purpose of the stop. Specifically, Defendant Dodson had all information to check James' driver's license and determining whether there are any outstanding warrants, but she failed to do so. Defendant also prolonged the investigative detention despite having completed the inspection for the vehicle's registration and proof of insurance.

5.      At all relevant times, Plaintiff knew he had done nothing wrong, and continued to refuse to answer any of Defendants' questions. Defendants Dodson and Guerrero continued the nonconsensual investigation of Mr. Thompson, requesting something with Plaintiff's name on it. At the same time, Defendant Guerrero saw an ID badge containing Plaintiff's name hanging on the rearview mirror and wrote it on a notepad and provided it to Defendant Dodson after approximately six (6) minutes into the stop. The hanging ID badge did not present any evidence of a crime that was immediately apparent to the officer.

6.      Defendant Dodson took the notepad while Defendant Guerrero continued to speak to Plaintiff. Additional Dallas Police Department ("DPD") officers, Terrence J. Forest ("Forest") and Dina M. Rodriguez ("Rodriguez") arrived on the scene as Defendant Dodson was sitting in her unit, calling Defendant Hartger, her supervisor, to the scene. Defendant Dodson advised Forest and Rodriguez that Plaintiff was refusing to give his information, that he was being "a little extra," had already requested a supervisor and that the Sargent was coming, and that she

"didn't know what was up with him." She then advised that Defendant Guerrero "possibly" saw a name on a badge that Plaintiff had taken down from the rearview mirror, so he "might be wanted." Based on all information and belief, at approximately eight (8) minutes into the stop, Defendant Dodson began running a check on the name shown on the ID badge and found who she thought was Plaintiff.

7.      Defendant Dodson then instructed Guerrero, Foster, and Rodriguez to help remove Plaintiff from the vehicle and he was placed in handcuffs. Defendant Dodson advised that he was being arrested for outstanding warrants and removed Plaintiff's belongings from his pockets. Plaintiff instructed Defendant Dodson to give James everything, and while Defendant Dodson was doing so, she advised James that she never looked at the proof of insurance and identification card that James provided at the time of the stop. James then handed the proof of insurance to Foster, who reviewed the same. The documents were given back to James, and Defendant Dodson advised James that Plaintiff was being taken to jail for "little ticket warrants" and "failure to ID." Defendant Dodson gave James her identification card back, and James was released from the traffic stop without a citation or even a verbal warning seventeen (17) minutes after the police-observed traffic violation.

8.      At nineteen minutes and twenty-five seconds (19:25) into the traffic stop, while Plaintiff was already in handcuffs and in the back of the unit, Defendant Dodson contacted dispatch requesting for the warrants to be confirmed.

9.      While Defendant Dodson was waiting for confirmation, Defendant Hartger, arrived on scene at Plaintiff's request. After a minute and fourteen seconds (1:14) into their conversation, Defendant Hartger admitted to Plaintiff that he was within his rights to remain silent when he did not violate any traffic infraction or violate any laws. Defendant Hartger further confirmed that

Plaintiff did nothing wrong by sitting in his seat and refusing to identify himself. Nevertheless, Defendant Hartger upheld Plaintiff being arrested stating that it was unusual and/or suspicious for Plaintiff to refuse to give his name. Defendant Hartger further indicated that because of the area they were in, the Officers decided to continue detention to check the name seen inside the car against the warrants.

10.     After twenty minutes and thirty-five seconds (20:35), the operator reported to Defendant Dodson that there were four (4) warrants. Thereafter, Defendant Dodson stood with the other officers on scene laughing as she advised, "I get to do the report for this one!" Noticing the wry expression on her face, Foster laughed that she'd do it "with pleasure!" and the DPD officers all laugh together as Defendant Dodson shrugs. At twenty-one minutes and one second (21:01) after the stop was initiated, Defendant Dodson suggests that because of "everything he was doing," she was "like, he got warrants" just because of "the way he was acting and going about."

11.     At the same time, Defendant Guerrero indicated that he initially shared the same thought, but the "more and more Plaintiff talked" came to conclude that "maybe he really is just trying to prove a point." It was not until this conversation that Defendant Guerrero ever suggested that Plaintiff did anything wrong but saying "I guess not" following the prolonged investigation to allowed Defendant Dodson to become lucky enough to find the active warrants.

12.     While speaking to her colleagues Defendant Dodson admits that it is "perfectly fine" for someone not to answer Officer's questions "if you're clear and stuff." Nevertheless, Defendant Dodson reported that Mr. Thompson "intentionally" gave "a false and fictitious name, residence address, and date of birth."[1]

---

[1] This is a violation of Texas Penal Code § 38.02, a Class B misdemeanor, which carries a punishment range of up to 180 days in jail, a fine of as much as $2,000.00 or both.

13.    Plaintiff was then booked in under the case carrying cause number MB2158878 in Dallas County for Failure to identify Fugitive from Justice. Plaintiff remained in jail from August 13, 2021, until August 19, 2021, when he was released from the Dallas County jail on a personal recognizance bond. On March 32, 2022, the State of Texas dismissed the charges without incident. Based upon all information and belief, this dismissal followed the review why the District Attorney who found that no probable cause existed believe the Plaintiff committed the crime.

14.    Indeed, no probable cause ever existed to believe that Mr. Thompson committed the crime of failure to identify fugitive from justice. Instead, acting in accordance with the policies and practices of DPD and the City of Dallas, Defendants, individually and collectively, violated Mr. Thompson's Fourth and Fourteenth Amendment rights under the Constitution of the United States by both engaging in and allowing acts leading to his unlawful arrest and prosecution, including but not limited to: woefully mismanaging a traffic stop investigation, unjustifiably seizing Plaintiff during a traffic stop when the time reasonably required to complete the mission of issuing a ticket had passed, prolonging the investigative detention longer than reasonably necessary to effectuate the purpose of the stop, and, subsequently, relying on an item in plain view to ID Plaintiff when it was not immediately apparent to the officer that the item is evidence of a crime to procure an arrest warrant against Mr. Thompson despite knowing of the statement's falsity; knowingly providing a incident report and narrative in support of the arrest warrant that contained several material omissions and false statements, without which, probable cause could not have been found; and arresting and incarcerating Mr. Thompson without sufficient probable cause.

15.    For these civil rights violations and other causes of action discussed herein, Plaintiff seeks answers and compensation for damages.

## SUBJECT MATTER JURISDICTION AND VENUE

16.    Jurisdiction exists in this court pursuant to 28 U.S.C. §§ 1331 and 1343 as this action is brought under, inter alia, the Fourth Amendment of the United States Constitution and 42 U.S.C. §1983, to redress the deprivation of rights, privileges and immunities guaranteed to Plaintiff, by constitutional and statutory provisions.

17.    Venue is proper in this court because the causes of action occurred within the Northern District of Texas.

## PARTIES AND PERSONAL JURISDICTION

18.    Plaintiff, Eric Dwayne Thompson, is an individual residing in Dallas County, Texas.  The last three numbers of his Texas license are 246.  The last three digits of his social security number are 752.

19.    Defendant City of Dallas, Texas is a local government entity within the State of Texas, located within Dallas County, Texas.  The City of Dallas, Texas, through its elected and appointed officers, is vested with the government and management of municipal law enforcement functions, such DPD. At all times relevant to this action, DPD was an agency of the City of Dallas through which the city fulfills its policing functions. DPD sets city-wide policies for the police officers it employs. Employees (and former employee(s)), agents, and officers of the City of Dallas were responsible for the various violations of law in this case.

20.    At all times relevant to this action, Defendant Dodson (badge number was 10848), who is being sued in her individual capacity, was an officer employed by the City of Dallas as a DPD police officer. All of Defendant Dodson's actions and/or inactions were taken under color of

state law and within the scope of her employment as an DPD officer. She is being sued in her individual capacity.

21.     At all times relevant to this action, Defendant Guerrero (badge number was 10801), who is being sued in his individual capacity, was an officer employed by the City of Dallas as a DPD police officer. All of Defendant Guerrero's actions and/or inactions were taken under color of state law and within the scope of his employment as an DPD officer. He is being sued in his individual capacity.

22.     At all times relevant to this action, Defendant Hartger (badge number was 8046) was employed by the City of Dallas as an DPD police sergeant. All of Defendant Hartger's actions and/or inactions were taken under color of state law and within the scope of his employment as an DPD officer. He is being sued in his individual capacity.

## FACTS

**A.     The Traffic Stop**

23.     On or around August 13, 2021, at approximately 11:35 am, Plaintiff was a passenger in the vehicle driven by his significant other, James. He was preparing to go to work after meeting his grandchildren to give them the school supplies that he had recently purchased for them.

24.     James was stopped at a stop sign at the intersection of Independence Drive and West Camp Wisdom Road, when the DPD officers pulled behind the vehicle. Defendant Dodson was driving the DPD squad car.

25.     As the DPD squad car approached the stop sign where James was at a standstill, James turned the vehicle into far-left lane of westbound West Camp Wisdom Road. Defendant Dodson approached the stop sign, and then followed in the path of James, making a wide right turn into the far-left lane of West Camp Wisdom Road and began to quickly accelerate. Defendant

Dodson pulled behind the vehicle, as it was pulling into a left-hand turn lane of the business located at 4201 West Camp Wisdom Road, Dallas, Texas 75237.

26.     According to narrative conveyed by Defendant Dodson in the incident report, a registration check of the vehicle also revealed that the Ford's registration had been expired since August of 2020.

27.     Defendants Dodson and Guerrero conducted a traffic stop of the vehicle, with Dodson approaching the driver's side and Guerrero approaching the passenger side where Plaintiff was seated.

## B.     The Investigative Detention

28.     At the time of the incident, on or around August 13, 2021, at approximately 11:35 am, the DPD officers indicated that the vehicle was stopped for an improper right turn.[2] They also indicated when speaking to James and Mr. Thompson, that prior to stopping the vehicle, they had determined that the vehicle's registration was expired. [3]

29.     Defendant Dodson and Defendant Guerrero knew or should have known that a seizure justified only by a police-observed traffic violation becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket. Likewise, Defendants knew or should have known that an investigation following a traffic stop involves checking the operator's driver's license, determining whether there are any outstanding warrants, and inspecting for registration and proof of insurance.[4]

---

[2] *Tex. Transp. Code § 545.101(a)*: To make a right turn at an intersection, ___**an operator**___ shall make both the approach and the turn as closely as practicable to the right-hand curb or edge of the roadway.

[3] *Tex. Transp. Code § 502.407*(a) A person commits an offense if, after the fifth working day after the date the registration for the vehicle expires. . . ___**the person operates**___ on a public highway during a registration period a motor vehicle. . . that has attached to it a license plate for the preceding period; and the license plate has not been validated by the attachment of a registration insignia for the registration period in effect. Even more, pursuant to *Tex. Transp. Code § 502.472*: A person commits an offense if the person operates a motor vehicle that has not been registered or registered for a class other than that to which the vehicle belongs as required by law.

[4] *State v. Dominguez*, No. 08-21-00036-CR, 2022 Tex. App. LEXIS 6065, at *7 (Tex. App.—El Paso Aug. 18, 2022, pet. ref'd)

30.     The officers however failed to prolong the traffic stop for any lawful reason. During the stop the events with Plaintiff were consistent with innocent activity and the prolonged investigative detention was therefore unlawful.[5] Plaintiff was initially subjected to the prolong detention by the Defendant DPD Officer, because at the inception of the investigation, it is clear that the officers had no reasonable suspicion, neglected to take steps to effectuate the purpose of the stop for the intended purpose of getting lucky, and that no circumstance justified the interference and investigation of Plaintiff in the first place.

### i.     Defendant Dodson's Interaction with James

31.     Defendant Dodson approached the driver's side of the vehicle. As she approached the window, she removed her sunglasses and placed them on top of her head and greeted James. She squatted down into the window, where she had a clear view of both occupants and advised that the registration showed to be expired and requested updated registration.

32.     James handed Defendant Dodson some documents that were the vehicle's insurance information. Defendant Dodson briefly examined the documents and then asked James if there was anything in the car that she needed to know about, such as guns or drugs.

33.     James responded that there was not and handed Defendant Dodson her identification card.

34.     Defendant Dodson never spoke to James again until fifteen minutes and twenty-three seconds (15:23) after the vehicle was stopped for the moving violation. Defendant then explained to James that Plaintiff had a warrant and was being arrested. Defendant told James, "all he had to do was talk to us." She further explained to James that she did not get a chance to take a look at the paperwork that she had returned to her at four minutes and twenty-nine seconds (4:29) into

---

[5] Johnson v. State, 658 S.W.2d 623, 626 (Tex.Crim.App.1983).

the stop. Defendant Dodson persistently questioned James about anything else Plaintiff might have had in the vehicle that she needed to know about. After James refused to allow a search of the vehicle, James was released from the scene without a citation approximately seventeen (17) minutes after Defendant Dodson first pulled the vehicle over.

### ii.    *Defendant Dodson's Interaction with Plaintiff*

35.     As Defendant Dodson was flipping through the paperwork, her attention turned to the conversation taking place between Defendant Guerrero and the Plaintiff. She first asked what was going on and if everything was okay. A Guerrero moments later, Defendant Guerrero if Plaintiff has given him his ID, to which Defendant Guerrero answered in the negative.

36.     Defendant Dodson then began to address Plaintiff, explaining that in the State of Texas everyone in a vehicle is detained on a traffic stop, and that there seemed to be some registration issues and a moving traffic violation, and requested his last name. Plaintiff responded that he was pleading the 5th, to which Defendant Dodson began responding to before being interrupted by James, who wanted to know what moving violation was committed.

37.     For a brief moment, Defendant Dodson turned her attention back to James, explaining that she made an improper wide right turn, and was supposed to commit to the right lane, before moving over to the left.

38.     Defendant Dodson then immediately went back to addressing Plaintiff, requesting that if he didn't want to talk about it, he could provide something with his name on it.  Plaintiff was then speaking back to Defendant Guerrero, so Defendant Dodson asked James for his last name. James replied that she had already provided her ID to Defendant Dodson, who had the information in her hand, and that she'd done what she was supposed to do.

39.     Defendant Dodson indicated that she appreciated that, but without Plaintiff's name, this was going to be a longer process, and then tried to call for backup, before handing James back her proof of insurance at four minutes and twenty-nine seconds (4:29) into the stop.

40.     The radio became clear, and Defendant Dodson than continued to call for backup at four minutes and fifty-five seconds (4:55) into the traffic stop.

41.     At five minutes and thirty-eight seconds (5:38) into the traffic stop, Defendant Dodson advised Plaintiff that she was about to call a supervisor out to the scene, per his request. At that time, Defendant Dodson left the driver's side of the vehicle and proceeded to walk around to the passenger side of the vehicle, where she took a notepad from Defendant Guerrero. When she asked "what's this for," Defendant Guerrero only responded "Eric Thompson."

42.     Thereafter, Defendant Dodson returned to her DPD squad car, with James' ID and the notepad from Defendant Guerrero still in hand. Upon entering the vehicle, she reached out to her sergeant as she began inputting information on the squad car computer or mobile data terminal ("MDT") at six minutes and twenty seconds (6:20) into the stop. She advised the sergeant ten seconds later (6:30) that they "had a guy who is refusing to give his info., and kind of being a little extra, . . .who's a passenger in this vehicle." She also indicated that she had another cover element coming and they were going "to get him out of the car and talk to him a little more and stuff . . . . He wanting to speak to a supervisor, so [she] told him [she'd] be nice and get one started for him."

43.     Based on all information and belief, while she was speaking to her sergeant, at six minutes and forty-five seconds (6:45) into the stop, Defendant Dodson had completed her investigation of James on the MDT and then began to search the name "Eric Thompson."

44.     At approximately seven minutes and seventeen seconds (7:17) into the traffic stop the cover element arrived and Defendant Dodson advised the additional officers that "he is refusing to give his info, and he's kinda being a little extra, he's already requested a supervisor . . . but we 'bout ta. . ." Officer Rodriguez asked for clarification of which occupant Defendant Dodson was speaking about. Defendant Dodson responded, "The passenger. The female is cool, the passenger, I don't know what's up with him. . . ." at seven minutes and thirty seconds (7:30) after the traffic stop.

45.     Although at that time, Defendant Dodson knew James, the driver, had a current valid license, no outstanding warrants, and that the care was not stolen, the traffic stop investigation was not resolved. Instead, the Defendant proceeded to prolong the traffic stop beyond the time reasonably required to complete the mission of issuing a ticket. She remained inside the DPD squad car, running searches on the name Defendant Guerrero wrote on the notepad and thought that she found someone that was him at eight minutes and fifty-four seconds (8:54) into the stop for a traffic violation.

46.     She continued her search of the name until she exited the DPD squad car at twelve minutes and fourteen seconds (12:14) after the stop.

47.     Defendant Dodson then asked Defendant Guerrero if the Plaintiff had said anything different to him, and signaled to Defendant Guerrero to remove Mr. Thompson from the vehicle while asking if he got the name from the ID that was hanging up in the car. Once Defendant Guerrero reached inside the vehicle, unlocked and opened the door, Defendant Dodson requested that he exit the vehicle. When Plaintiff asked why and said he did not want to, Defendant Dodson responded, "because I'm telling you to step out of the car, and you haven't been listening this whole time."

48.     Thirteen minutes and ten seconds (13:10) after the traffic stop, Defendant Dodson placed Plaintiff in handcuff and placed him in the back of her DPD squad car after securing the contents of his pockets in a plastic bag.

49.     At nineteen minutes and twenty-six seconds (19:26), after Plaintiff was in handcuffed in the back of her unit and James was gone from the scene, Defendant Dodson called in to confirm possible warrants for Plaintiff.

### iii.     Defendant Guerrero's Interaction with Plaintiff

50.     Upon exiting the DPD squad car following the stop on the vehicle for moving violations, Defendant Guerrero immediately approached the passenger side of the vehicle and began addressing Plaintiff.

51.     Defendant Guerrero stood silently outside of the vehicle until one minute and three seconds (1:03) into the stop, when Plaintiff said, "I'm just a passenger." Once Plaintiff made the statement, Defendant Guerrero asked, "this is your car, right?" and Plaintiff responded that it was his wife's. Defendant Guerrero then asked who's name is the car under, and Plaintiff responded "mine." When Defendant Guerrero asked Plaintiff for his name, Mr. Thomas responded by advising that he did not want to give his information because he was a passenger and did not have to respond.

52.     Defendant Guerrero advised that they were only trying to identify who the vehicle belong to, and Plaintiff responded by advising that they could run the plates on the vehicle. Defendant Guerrero said "okay." Plaintiff then asked if they had already run the plates, which Defendant Guerrero responded at one minute and thirty-six seconds (1:36) into the stop, in the affirmative saying, "yea, we ran the plates." and then asked Plaintiff, "so you're the registered owner of the car."

53.     For a second, Defendant Dodson interrupts, but when Plaintiff refocuses his attention of Defendant Guerrero's question, he immediately advises the officer, "I don't want to answer your question." After Defendant Guerrero explains that they are trying to verify the owner again, Plaintiff reiterates that he does not want to answer any questions, to which Defendant again responds, "okay."

54.     At this moment, Defendant Dodson interrupts again, asking Defendant Guerrero if Plaintiff gave him an ID already, and the officer tells his colleague "no, he doesn't want to give it."

55.     Two minutes and forty-nine seconds (2:49) into the stop, Defendant Guerrero took out a notepad and began writing. While doing so, Plaintiff is continuing to tell Defendant Dodson that he does not want to speak to them at all.

56.     Plaintiff asked Defendant Guerrero if it is true that "unless you've committed a crime or something like that, you don't have to identify." Defendant Guerrero responds by telling Plaintiff that in "different situations, yea." Defendant Guerrero goes on to indicate that everyone in the vehicle was detained at three minutes and twenty-five seconds (3:25) into the stop. He then told Plaintiff that he already admitted that the vehicle was his, and that the registration was out on Plaintiff's vehicle. Plaintiff threw his hands in the air and stated, "I'm just a passenger." and expressed his appreciation for the officer's response at three minutes and forty-three seconds (3:43) after the vehicle was pulled over.

57.     About fifteen (15) seconds later, Plaintiff explains that he is not understand, because the thought that unless you committed a crime that is when you are supposed to ID yourself. At this point Defendant Guerrero remains silent and just continues standing alongside the vehicle.

58.     At four minutes and fifty-five seconds (4:55) into the stop, Plaintiff overhears Defendant Dodson's call for backup, and asks Defendant Guerrero, why is she calling for backup, and asked the officer to also call a supervisor to the scene. After the Plaintiff rapidly repeated his request for Defendant Guerrero to call a supervisor, the officer promptly replied, "I've gotta wait for them to get off the radio man!" Plaintiff calmly responded, "I didn't know all of y'all were on the same channel," to which Defendant Guerrero responded, "I mean you hear it, right?"

59.     After the vehicle was stopped for five minutes and twenty-three (5:23) seconds, Defendant Guerrero asked Defendant Dodson if she wanted to get a supervisor out there since he Plaintiff was asking for one.

60.     Defendant Guerrero motions for Defendant Dodson to come get the notepad he had taken out at about five minutes and forty-five seconds (5:45) into the traffic stop as she began walking towards the DPD squad car and says "Eric Thompson."

61.     At six minutes (6:00) into the traffic stop, James Plaintiff begins asking Defendant Guerrero questions pertaining to the improper wide turn. James remakes that "all of this is unnecessary," to which Defendant Guerrero responds, "it is unnecessary, but when someone else is in the car, ya know." At six minutes and twenty-three seconds (6:23) James states, "but I'm the driver, and I IDed myself," and Defendant Guerrero agreed.

62.     Plaintiff then says to Defendant Guerrero, "That's what I'm saying. Y'all got a problem, with her driving, right?" Defendant Guerrero answered in the affirmative, but also explained that everyone in the vehicle is detained. At no time did Defendant Guerrero explain that the lawful detention of persons in a traffic stop was only supposed to be temporary nor did he advise that an investigative detention must last no longer than is necessary to effectuate the purpose of the stop.

63.     Following Defendant Guerrero's explanation, Plaintiff asked at six minutes and thirty-one seconds (6:31) into the stop, "but I still have the right not speak and not say nothing?" to which Defendant Guerrero responded, "and you do." Plaintiff then ask, "at that point, how are you proceeding?" and Defendant Guerrero indicates that despite Plaintiff's lack of consent to the investigation, he was "still trying to identify who" Plaintiff was.

64.     At six minutes and forty-two seconds (6:42) Defendant Guerrero explains, "You have the right to not say anything, and I still have to finish my investigation." Defendant Guerrero again fails to advise that the investigative detention was only lawful to effectuate the purpose of the stop.

65.     Defendant Guerrero however describes that his investigation was "trying to figure out who all is in the car, who he is talking to."

66.     Plaintiff then asked why they were not dealing solely with the person who committed the traffic infraction, and Defendant Guerrero responded, "we were dealing with both of y'all." At six minutes and fifty-five seconds (6:55), Plaintiff just shakes his head, and says "that's crazy" and reiterates that he believed that there was no reason to identify himself if he'd done nothing wrong.

67.     Plaintiff asked Defendant Guerrero, "don't I have to do something wrong?" At seven minutes and four seconds (7:04) into the stop, the DPD officer replied, "I'm not saying you did or didn't do anything wrong." Plaintiff and Defendant Guerrero then begin an exchange where Plaintiff again reiterates that pursuant to the law, the "only way" that he could "fail to ID" is if he committed a crime and didn't provide his ID. Defendant Guerrero made noises in agreement. Plaintiff proceeded asking that "if [he] hasn't committed a crime, whether [he is] in the backseat, if [he's] not the one who committed the infraction, then why would [the officer] identify [him]?"

Defendant Guerrero begins responding at seven minutes and twenty-seven seconds (7:27) into the stop and indicates that he "doesn't know anything about here," referring to the specific situation involving Plaintiff that justified the need to ID Mr. Thompson.

68.     The conversation ended there as Foster appeared at the driver's side of the vehicle and began speaking to James, until Plaintiff turned to Defendant Guerrero at eight minutes and forty-four seconds (8:44) into the stop, and asked "Do you have reasonable suspicion?"

69.     Defendant Guerrero then remarks, "Reasonable suspicion? For what?" Plaintiff then explains that per Foster's explanation, reasonable suspicion would be the only reason that Defendant Guerrero would need to ID him. Then at eight minutes and fifty-five seconds (8:55) into the stop, Defendant Guerrero admits "we're just trying to identify who is all in the vehicle" and Plaintiff responds with the question, "so you don't have to, you want to?" Defendant Guerrero makes a noise in agreement. Plaintiff continues, "and I said I didn't want to, so at that point, shouldn't it be over?" Defendant Guerrero replies, "not necessarily." When Plaintiff asked if that was because Defendant Guerrero didn't want it to be over, again the officer makes a noise in agreement.

70.     Plaintiff continues to ask Defendant Guerrero why he wouldn't leave him alone when there was clearly no reasonable suspicion. Defendant Guerrero then represents that he was justified in his prolonged investigative detention of Plaintiff because, "the reasonable suspicion he [had] at [that] point, was [Plaintiff was] refusing to give him [his] information."

71.     Nine minutes and twenty seconds (9:20) after the vehicle had been pulled over, Plaintiff asks Defendant Guerrero, how refusing is suspicious and if the contention is supported by law. Defendant Guerrero responds that "suspicion is different from probable cause." Rather than

answer Plaintiff's question, Defendant Guerrero states, "I haven't overstepped any of my boundaries."

72.     Plaintiff then explains that in his understanding and exercise of the law, he is at liberty to talk to the officers, but does not have to answer any questions. Defendant Guerrero then exclaims that he "hasn't tried to make" Plaintiff. Plaintiff then remarks, at nine minutes and forty-nine seconds (9:49) after the stop, "you've asked me a couple of times, but I keep giving you the same answer. . . but my point is after that."

73.     Defendant Guerrero interrupts and says that his only task is to exhaust all of his efforts in investigating who the Plaintiff is and who he is not. The officer goes on to say that "once he has exhausted all efforts. . ." then the conversation ceases because Plaintiff started speaking to Foster about wanting clarification of the law, in order to properly exercise his rights.

74.     At twelve minutes and sixteen seconds (12:16) into the prolonged investigative detention, Plaintiff turns back in the direction of Defendant Guerrero, who was speaking to Rodriguez who'd come over to the passenger side of the vehicle. Plaintiff remarks that he is just exercising his rights and wants to make sure the officers are respecting their civil rights just as Defendant Dodson is approaching from her squad car.

75.     Defendant Dodson motions to Defendant Guerrero to open the car door at twelve minutes and forty-three seconds (12:43). As Rodriguez steps out of Defendant Dodson's way, Defendant Guerrero reaches inside the vehicle, unlocks, and opens the door. Defendant Guerrero grabs Plaintiff's right wrist through the back passenger window that was down as Mr. Thompson is standing to get out of the vehicle with Defendant Dodson grabbing his left arm, subsequently placing Plaintiff in handcuffs.

**C.**     **The Sergeant's Gross Mismanagement of the Traffic Stop Investigative Detention**

     ***i.***     ***Defendant Hartger's Arrival at the Scene***

76.     Defendant Hartger arrived on the scene fourteen minutes and twenty-six seconds (14:26) after the DPD offices executed the traffic stop.

77.     Defendant Guerrero explained to the sergeant that they had stopped the vehicle for making a wide right turn. He noted that once they were pulled over, James gave them her information. He advises that he asked Mr. Thompson for his information, but that Plaintiff indicated that he was exercising his rights and wanted to know why they needed his information. Defendant Hartger listens as the officer then tells him that he obtained a name from a work badge and that Defendant Dodson ran a name on it. The officer reiterates that the entire time Plaintiff was asserting his rights and wanted to know why they were still there, and that he told Plaintiff, that he needed to exhaust everything to determine who he was.

78.     Following the explanation of events, Defendant Hartger approached the DPD squad car, and opened the door where Plaintiff was sitting at fifteen minutes and thirty-nine seconds (15:39) after the vehicle had been pulled over for the moving violation. Defendant Hartger then motions for Defendant Guerrero to walk away. At sixteen minutes and twenty-six seconds (16:26), Rodriguez joins Defendant Hartger at the back of the squad car followed by Defendant Dodson getting in the front seat of the DPD until at seventeen minutes and twenty-seven seconds (16:27), following the traffic stop, at which point James had been released without a warning or citation for the improper turn nor vehicle registration.

ii.     **Defendant Hartger's Interactions with Plaintiff**

79.     Defendant Hartger begins his conversation with the Plaintiff at about sixteen minutes and eighteen seconds (16:18) after the stop had occurred. At this point, James was still present on the scene.

80.     Plaintiff explains that when they were pulled over, based on his knowledge of the law, when the plates were run and the vehicle was stopped, "the infraction was on [his] wife." Defendant Hartger expressed agreement at sixteen minutes and forty seconds (16:40) following the stop.

81.     Plaintiff then indicates that the officers went about identifying everyone in the car, and he thought he had the right to remain silent, and that he did not have to answer any questions because he did not violate anything, broken any laws, or made any infractions. Plaintiff set forward that it was for this reason that he advised the DPD officers that he did not want to ID himself, and asked Defendant Hartger, "was I within my rights," to which the DPD Sergeant responded "yeah!"

82.     Plaintiff went on to explain to Defendant Hartger that he was headed to work in order to take care of his family. Mr. Thompson then asked Defendant Hartger, at seventeen minutes and nineteen seconds (17:19) into the stop, while James was still on the scene in the vehicle, "did I do anything, sitting in my seatbelt, that required me to have to ID?" Defendant Hartger promptly responded, "no!"

83.     Following Defendant Hartger's acknowledgement of the fact that Plaintiff had done nothing wrong that prompted the investigation into his identity, he asked the sergeant, "then why am I [going to][sic] jail right now?"

84.     The sergeant knew or should have known that despite the badge being in plain view, officers must have probable cause to believe that items in plain view are contraband before they may investigate. Nevertheless, Defendant Hartger responded by indicating that it was because the officers used his name seen on the work badge to investigate who he was, and find the traffic tickets.

85.     Seventeen minutes and thirty-three seconds (17:33) into the stop, as the officers began walking away from the vehicle following them releasing James, Plaintiff told Defendant Hartger that the officers "basically just stole his ID versus asking for [his] ID if he didn't want to give it to them."

86.     Defendant Hartger then asked the Plaintiff how the officers obtained his name, and Plaintiff requested that the sergeant ask them, because he didn't know. Defendant Hartger responded that he already talked to them. Plaintiff then complained as James began leaving the scene seventeen minutes and fifty seconds (17:50) after the stop, that he wasn't doing anything to make it an investigation, and that he should have been free to go about his business without having to ID himself.

87.     Defendant Hartger then attempted to justify the prolonged investigative detention following the traffic stop. He said, "They stopped you. They were handling that. You refused to give your name, and that's fine. That's absolutely your right. However, that's unusual." Plaintiff attempts to ask a question, but the DPD sergeant tells him to hold on and continues, "that happens far less often than it does happen." Plaintiff responds, "because we are starting to learn our rights. . . and I wanted to exercise them, and I shouldn't have been penalized for doing so."

88.     Defendant Hartger doesn't address this statement made by Plaintiff but continues on. Despite neither Defendant Dodson nor Defendant Guerrero advising that anything in their

experience led them to further investigate, Defendant Hartger upheld their actions saying that the officers were "aware that a lot of people come through there with warrants."

89.     Defendant Hartger goes on saying that the officers saw something with his name on something in the car, and they decided to use that detention to check his name against the warrants. The DPD Sergeant fails to acknowledge that during an investigation following a traffic stop, the law does not permit an officer to prolong the detention beyond reasons for the initial traffic stop. He further fails to recognize that a prolonged investigation is only permissible when a police officer has specific articulable facts, combined with rational inferences, that lead him to reasonably conclude that the person detained is, has been, or soon will be engaged in criminal activity.

90.     Defendant Hartger's conversation with the Plaintiff lasted until approximately twenty-two minutes and eight seconds (22:08) after the vehicle was stopped.

### iii.     Defendant Hartger's Inaction with Defendant Dodson, The Arresting Officer

91.     At no time did Defendant Hartger speak to Defendant Dodson aside from her initial call to him. Upon his arrival and before closing the door to the squad car that took Plaintiff to jail, Defendant Hartger made no effort to determine whether there was any objectively justifiable basis for the prolonged detention, which led to Plaintiff's arrest.

92.     Defendant Hartger never asked Defendant Dodson or Defendant Guerrero what measured has been taken in investigation of the traffic violation that justified the initial seizure.[6]

93.     Defendant Hartger made no effort to determine whether the investigation into Plaintiff's identity had any close connection to roadway safety, the ordinary inquiries incident to a traffic

---

[6]   Beyond determining whether to issue a traffic citation, an officer's mission during a traffic stop includes "ordinary inquiries incident to [the traffic] stop." *Rodriguez v. United States*, 575 U.S. 348, 355, 135 S.Ct. 1609, 191 L.Ed.2d 492 (2015), quoting *Illinois v. Caballes*, 543 U.S. 405, 408, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). Such inquiries typically involve determining whether there are outstanding warrants ***against the driver***, running a record's check on the ***driver's license***, and inspecting the vehicle's registration and proof of insurance. See *id.* (noting that these checks serve the same purpose as enforcement of the traffic code by ensuring vehicles are operated safely).

stop, and/or if the investigation of the name shown on the work badge was in anyway characterized as part of the officer's traffic mission.

94.     Defendant Hartger never made any inquiry into whether the officers took any steps that resembled any task associated with the traffic stop.[7] For example, at no time did he ever verify if Defendant Dodson took steps to have dispatch confirm insurance information as she continued with the traffic investigation.

95.     Even more, Defendant Hartger made no determination about whether the officer's questioning of Plaintiff, which was unrelated to the purpose of the traffic stop, was the cause of the traffic's duration being extended.[8]

96.     In fact, at the moment Plaintiff was taken in the DPD squad car, the sergeant on the scene had no knowledge if his offices at any time initiated or completed a computer check of James, nor if they knew if James had a current valid license or outstanding warrants. He further neglected to ask the officers if they made any determination about whether the car was stolen, and therefore had no knowledge about whether the traffic stop investigation was at any point, conducted.

97.     What is notable however, is that Defendant Hartger did know that during the traffic stop, there was nothing that allowed the officers to develop reasonable suspicion that James nor Plaintiff was involved in criminal activity. Therefore, Defendant Hartger knew or should have known that the officers were not permitted to continue questioning the individuals in this traffic stop, regardless of whether the official tasks of a traffic stop had come to an end.

---

[7] A traffic stop made to investigate a traffic violation must be reasonably related to that purpose and may not be prolonged beyond the time to complete the tasks associated with the traffic stop. *Lerma v. State*, 543 S.W.3d 184, 190 (Tex. Crim. App. 2018), citing *Kothe v. State*, 152 S.W.3d 54, 63-64 (Tex. Crim. App. 2004).

[8] "An officer is also permitted to ask drivers and passengers about matters unrelated to the purpose of the stop, so long as the questioning does not measurably extend the duration of the stop" *Lerma v. State*, 543 S.W.3d 184, 190 (Tex. Crim. App. 2018).

### iv.    Defendant Hartger's Justification of a Mere Hunch

98.    When Defendant Hartger upheld the arrest made by Defendant Dodson, he told Plaintiff that his behavior was "unusual." He insisted that because the officers knew people were in the area with warrants, Plaintiff not answering their questions provoked the investigation beyond a traffic stop.

99.    At the moment these statements were made by Defendant Hartger, neither officer had made any statement of the sort to the sergeant pertaining to this unlawful investigation. Even if they had, as a DPD sergeant, he knew or should have known that law enforcement officers must rely on concrete facts, not just vague suspicions, or general hunches, and that no circumstances of the officer's interactions with Plaintiff amounted to justifiable reasonable suspicion.

100.    Only as the officers conversated about following the arrest did Defendant Dodson and Defendant Guerrero indicate that they had a mere hunch that Plaintiff didn't want to answer their questions for unknown reasons. They each joked about having an intuitive feeling that he might have had warrants, but no specific evidence could be articulated between either of them of the same. As such, Defendants Dodson, Guerrero, and Hartger each acted in concert knowing that the traffic stop was prolonged, absent any reasonable suspicion of some other criminal activity that would justify continued detention and subsequently, Plaintiff's arrest.[9]

### D.    Defendant Dodson and Defendant Guerrero prolonged the Traffic Stop Investigative Detention Beyond Initial Justification

101.    It is settled that the vehicle's registration was expired. Likewise, James never disputed that she made a right turn into the left lane. As such, Defendant Dodson and Defendant Guerrero justifiably initiated the traffic stop.

---

[9] "[O]nce the reason for the stop has been satisfied, the stop may not be used as a 'fishing expedition for unrelated criminal activity.'" *Davis v. State*, 947 S.W.2d 240, 243 (Tex. Crim. App. 1997), quoting *Ohio v. Robinette*, 519 U.S. 33, 41, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (Ginsberg, J., concurring).

102.    In an attempt to gin up probable cause to arrest Plaintiff, the Defendant officers improperly prolonged the detention beyond its initial justification. Specifically, Defendant Dodson intentionally or knowingly failed to conduct computer searches on James and the vehicle to confirm that the operator and vehicle could be safely operated on the roadway. Instead, she pursued identifying the passenger Plaintiff, without justification.

103.    Had the said Defendants respected Plaintiff's right to exercise the ability to remain silent, refuse to answer questions or identify himself without reasonable suspicion, they would have had no desire to continue to detain Plaintiff past the initial reason for the traffic stop.

104.    Defendant Dodson had requested another cover unit to the scene, and Foster and Rodriguez arrived before she ever conducted any computer check on the name "Eric Thompson." Likewise, Plaintiff was already arrested and placed in the squad car before any warrants were ever confirmed by the operator.

105.    The time necessary to complete the investigation into the expired registration and improper turn ended at the latest, when James admitted the offenses. Thus, any detention that extended beyond the time necessary to acquire James' personal information, check her information with dispatch, and write a citation for the traffic violations was unreasonable.

106.    Defendant Dodson and Defendant Guerrero would have needed the existence of some other criminal activity to justify Plaintiff's continued detention. The Defendants however deliberately enticed Plaintiff by asking him to identify himself when he had done nothing wrong and had repeatedly expressed that he did not consent to their questioning. At the time the investigation of the name shown on the badge was done, the said Defendants were unable to articulate something more than an inchoate and unparticularized suspicion or hunch that Plaintiff was engaged in criminal activity.

107.    The Defendants were not still actively involved in the traffic stop when they continued to question Plaintiff, because James' admission of the traffic offenses completed the investigation. The DPD officers did not observe evident of any additional criminal offenses in their presence following the conclusion of this traffic stop investigation. Defendants Dodson and Guerrero presented no information about the existence of additional reasonable suspicion to suggest that some other criminal activity was afoot.

108.    Nothing in this instance suggest at either officer had reasonable suspicion of some other criminal activity to justify Plaintiff's continued detention as Defendant Dodson ran searches on the name written on Defendant Guerrero's notepad. Likewise, the only arguable relevant fact, that Plaintiff had existing traffic warrants, was not confirmed until nearly seven (7) minutes after he had already been placed in handcuffs and put into the squad car. Therefore, before Plaintiff was arrested, neither officer had sufficient information to collectively amount to reasonable suspicion that Plaintiff was engaged in some other criminal activity.

**E.    The Plaint-View Investigation was Conducted After the Lack of Justification for Extending the Traffic Stop**

109.    James ended the investigation of the traffic stop when she acknowledged that the vehicle's registration was expired, and that she'd made a wide right turn. She provided Defendant Dodson with her driver's license. Defendant Dodson searched James' driver's license and apparently found that it was valid and that James had no outstanding warrants. James also provided Defendant Dodson with insurance paperwork that verified that there was active coverage for the vehicle.

110.    Defendant Guerrero advised Plaintiff that prior to the stop, they had run the plates and apparently the officers knew that the vehicle was not stolen. Plaintiff told the officer that

although the vehicle was registered to his name, it was owned by his wife, James, who was the operator at the time of the stop.

111.    The officers continued to ask Plaintiff questions and for identifying information because they concluded that Mr. Thompson did not appear to be someone who would simply be exercising his rights to remain silent as a passenger in a vehicle stopped for a moving violation.

112.    The traffic stop investigation was therefore concluded prior to Defendant Guerrero seeing the work ID hanging on the rear-veiw mirror. Although the name was shown in plain view, the Officers conducted an unreasonable search because they lacked probable cause to believe that item in plain view was contraband. Likewise, it was not immediately apparent to either DPD officer that the name on the work ID was evidence of a crime.[10]

113.    Additionally, the investigation was well concluded before Defendant Dodson chose to prolong the stop while she searched for the name seen in plain-view on the MDT that she believed to be the passengers.

**F.      Material Lies and Omissions in Defendant Dodson's Statement of Probable Cause**

114.    As her malicious grin showed when she discussed completing the report at the scene with her colleagues, Defendant Dodson took joy in preparing an incident report for the arrest. In support of the charge, she wrote that on August 13, 2021, Mr. Thompson, "was lawfully detained and refused to provide identifying information while he was actively a fugitive from justice during a traffic stop."

115.    In an attempt to incite probable cause for the charge, Defendant Dodson knowingly and/or with reckless disregard for the truth, made numerous material omissions and false

---

[10]  A police officer may seize without a warrant any item in plain view when its discovery is inadvertent, and it is immediately apparent to the officer that the item is evidence of a crime, and the officer has a right to be in the place where the item was found. *Anderson v. State*, 787 S.W.2d 221, 228 (Tex. App.—Fort Worth 1990, no writ).

statements in her narrative report. Although neither officer at the traffic stop asked Mr. Thompson for anything other than his name, Defendant Dodson claimed that Plaintiff refused to provide any identification cards, name, date of birth, or any other identifying information to Defendant Guerrero. Defendant Dodson claims that she asked the occupants several times if they had any firearms or contraband in the vehicle and alleges that Plaintiff refused to answer the question. Defendant Dodson however misrepresents that these questions were asked of Plaintiff. This did not occur, Defendant Dodson only ever requested this information from James on two (2) separate occasions concerning the contents in the vehicle, first when the stop was initiated, and secondly after Plaintiff was in the squad car under arrest. This one statement from a discredited witness with ulterior motives would certainly have been insufficient to support a finding of reasonable suspicion. Any reasonable official knowing what Defendants Dodson and Guerrero knew that Plaintiff did not try to conceal illegal, would have known that reasonable suspicion did not exist and would not have pursued the investigation.

116.    Defendant Dodson's narrative again misrepresents that "James stated that she had given her own name which was enough and that she did not know what the passenger had going on or if he had warrants." This false statement is critical to a finding of reasonable suspicion to prolong the investigative detention.

117.    Defendant Dodson further states that "Guerrero #10801 asked A/PE. Thompson multiple times if he was the registered owner of the vehicle and A/P E. Thompson refused to admit whether or not he owned the vehicle or if his name was on the registration." Again, this is a false statement in an attempt to justify the prolonged unlawful detention beyond the purpose of the traffic stop.

118.    The narrative prepared by Defendant Dodson goes on to state:

"A/O I. Dodson #10848 used the name "Eric Thompson" from the ID badge to conduct a check of Dallas County Jail Records and observed that a Thompson, Eric Dwayne with the date of birth 01/24/1975 had a photograph matching A/PE. Thompson (**Information Redacted)[sic]**. A/O I. Dodson #10848 conducted a subject check which revealed that A/P E. Thompson had four warrants out of the Dallas Police Department, with a bond amount totaling $1,465.30. The warrants were confirmed by R. Hernandez with the Dallas Police Department. A/P E. Thompson was taken into custody for his warrants and failing to provide identifying information while a fugitive from justice."

Defendant however fails to include critical information verifying and providing context for when the search was conducted, and warrants were confirmed. Specifically, Defendant Dodson omits that:

- The traffic stop investigation had been concluded when James provided her identification and insurance papers and admitted to the traffic offenses;

- The traffic stop investigation was concluded when she ran investigative searches on the name "Eric Thompson;"

- Neither Officer had reasonable suspicion that with James not Plaintiff had committed any other unlawful offense when the search was conducted on the name Eric Thompson; and

- Plaintiff had already been placed in handcuff and was in the back of the squad car when R. Hernandez confirmed the warrants.

119.   Defendant Dodson's several material misstatements regarding Mr. Thompson in her narrative were still not enough to overcome the State's review of the evidence and dismissal of the fabricated and baseless claims.

## G.   Unlawful Arrest and Malicious Prosecution of Mr. Thompson for Failure to Identify Fugitive from Justice

120.   Based on Defendant Dodson's false statements and material misrepresentations, Plaintiff was arrested and taken to jail, charged with the misdemeanor offense of Failure to identify Fugitive from Justice in Cause No. MB2158878 in Dallas County Court of Criminal Appeals 2.

121.    At all times before approving the arrest, Defendant Hartger had a duty as the officer's sergeant and pursuant to DPD policy to review the evidence in support of the arrest. Had he adequately done so, Defendant Hartger would have or should have noted the discrepancies noted in the incident report, noticed the material lies and omissions in the narrative set forth by Dodson, realized that there was no reasonable suspicion to extend the traffic stop investigation, and intervened before Plaintiff's rights were violated. Defendant Hartger's failure to intervene and/or adequately supervise Defendants Dodson and Guerrero and his approval of their taking Plaintiff to jail, was a direct cause of Mr. Thompson's constitutional rights being violated.

122.    Defendants Dodson, Guerrero, and Hartger had no evidence to support the claim that Plaintiff committed the offense of failure to identify, and indeed none exists.

123.    Based on all information and belief, once at the jail, Plaintiff was booked and held in the mental health unit at the Lew Sterrett Justice Center. He remained there until his release on August 19, 2021. On the day he was released, Mr. Thompson found out that he'd lost his job, his housing, and his wife.

124.    At the time of Plaintiff's arrest, no reasonable official, with the information available to Defendants, could have objectively concluded that reasonable suspicion existed to support the prolonged detention that led to Mr. Thompson's arrest or criminal charge brought against him.

125.    On March 31, 2022, the State dismissed the charges in the interest of justice.

**H.    Defendants Lacked Probable Cause to Arrest and Charge Plaintiff with Failure to Identify Fugitive from Justice**

126.    Defendants charged Mr. Thompson with failure to identify Fugitive from Justice without probable cause to do so. Defendants' purported probable cause was based solely on Defendant

Dodson and Defendant Guerrero's unreasonable and unlawful investigative detention beyond the time reasonable to effectuate the purpose of the traffic stop.

127.    Defendants Dodson, Guerrero, and Hartger were all aware of and/or directed the material omissions and false statements made in Defendant Dodson's narrative.  Defendant Hartger knew or should have known of the material omissions and false statements in Defendant Dodson's narrative report, as Defendant's supervisor responsible for reviewing her incident reports, and should have intervened and/or not approved of Plaintiff going to jail, when the officers lacked reasonable suspicion to prolong the investigation of the traffic stop. Had Defendant Hartger acknowledged that the officers unlawfully detained Plaintiff beyond the time reasonably required to complete the mission of issuing a ticket, there would have undisputedly been no probable cause to arrest Plaintiff.

128.    Given the facts and circumstances available to Defendants at the time of the arrest, no reasonably prudent officer could have believed that Mr. Thompson had committed the crime of failure to identify -fugitive from justice.

129.    Under Texas law, a person commits the offense of failure to identify if he "intentionally refuses to give his name, residence address, or date of birth to a peace officer who has lawfully arrested the person and requested the information" or he "intentionally gives a false or fictitious name, residence address, or date of birth to a peace officer who has (1) lawfully arrested the person; (2) lawfully detained the person;  or (3) requested the information from a person that the peace officer has good cause to believe is a witness to a criminal offense" when he was a fugitive from justice at the time of the offense. *Tex. Pen. Code* § 38.02.[11] Here there was no probable

---

[11] Notably, this incident occurred on August 13, 2021, prior to the Texas Senate Bill 1551 (SB 1551) going into effect on September 1, 2023, which amended *Tex. Pen. Code* § 38.02 to include "(b-1) A person commits an offense if the person. . . (2) fails to provide or display the person's

cause to believe that Mr. Thompson intentionally refused to give his information to an office who had lawfully arrested him, nor gave false and fictitious information as an arrested or detained person, nor was a witness to a criminal offense. An officer needs probable cause of every element of an offense to secure an arrest.

130.    Regarding the elements, the only purported evidence that Mr. Thompson failed to identify as a fugitive from justice, was that he advised the officers that he did not want to answer their questions or identify himself when he'd done nothing wrong. This single statement from an individual who was not under arrest, who did not provide false or fictitious information, and was not a witness to a criminal offense is undoubtedly insufficient to support probable cause.

131.    Given the facts and circumstances available to Defendants at the time of Mr. Thompson's arrest, no reasonable officer could have objectively concluded that probable cause existed to support the arrest against Plaintiff.

**I.    The Customs, Policies and/or Practices of the City of Dallas and DPD Under the Direction of The Policymakers Caused the Violations of Plaintiff's Constitutional Rights**

132.    Mr. Thompson was unlawfully arrested as a result of several faulty customs, policies and/or practices in place at the City of Dallas and DPD as follows:

*i.    Failing to Enforce the Need for Reasonable Suspicion to Prolong a Traffic Stop*

133.    DPD has a longstanding policy, practice, and/or custom of officers failing to have justification to prolong the investigative detention of occupants in a motor vehicle following a traffic stop, once the traffic stop investigation is fully resolved.

134.    Although DPD and the policymakers have kept the total numbers confidential, there have been numerous internal affairs investigations related to DPD officers themselves refusing to

---

driver's license on the officer's request for the license; and (3) intentionally refuses to give the person's name, driver's license number, residence address, or date of birth to the peace officer on the officer's request for that information.

cooperate with other officers when they have been pulled over for a traffic stop, as well as, DPD Officers arresting civilians in traffic stops and then lying about the circumstances.

135.   However, despite acknowledging the seriousness of the problem, DPD and the policymakers continue to contribute to the lack of justifying prolong detentions in traffic stops. and have failed to implement proper training, procedures, and enforcement mechanisms to curb the incidence of unlawful traffic stop investigative detentions. The policy, practice, and culture of failing to responsibly enforce laws against unlawfully detaining occupants in a traffic stop longer than necessary to complete the mission of issuing a ticket, directly caused the violation of Mr. Thompson's constitutional rights.

136.   Due to Defendants Dodson, Guerrero, and Hartger's nonchalance of Plaintiff's clear right to remain silent and refuse to identify himself when no reasonable suspicion existed, they shifted their focused onto finding any reason to arrest Mr. Thompson. Thus, the failure to honor Plaintiff's constitutional rights, directly led to the unlawful investigation of Mr. Thompson's identity and subsequent findings of the four (4) traffic warrants.

137.   Additionally, none of the Defendants were not disciplined for their failure to properly investigate, conclude the traffic stop, and not prolong a traffic stop unless they are able to point to specific articulable facts, contrary to DPD's written policy, which demonstrates a ratification of their actions by DPD, City of Dallas, and the Policymakers.

138.   By taking the steps necessary to let the officers know he did not want to answer their questions, nor identify himself, when no reasonable suspicion existed, Mr. Thompson was merely exercising the rights afforded to him by the constitution. Defendants' decision to punish him for these actions was a direct result of the culture of DPD, City of Dallas, and the Policymakers' lax attitude towards unlawful detentions and investigation offenses.

### ii.    Condoning Dishonesty in DPD Investigations and Incident Reports

139.    Defendant City of Dallas and the policymakers also have long maintained a custom, policy and/or practice that condones dishonesty in criminal investigations, incident reports, and officer narratives.

140.    Not only did Defendant City of Dallas have a longstanding practice of mishandling and lying about prolong investigations during traffic stops, Defendant City of Dallas has also maintained a custom, policy and/or practice that allows and approves of DPD officers making material omissions and false statements in criminal investigations generally, including in incident reports and officer narratives when reasonable suspicion to prolong the stop does not actually exist.

141.    More egregious, when confronted with instances of officer misconduct involving dishonesty in incident reports – Defendant City of Dallas has a custom of failing to appropriately punish the offending officer and downplays the seriousness of the conduct. Defendant City of Dallas' practice of turning a blind eye towards dishonesty in policing fosters an environment where DPD officers are encouraged and/or feel comfortable in continuing to make false statements and material omissions in incident reports and narratives in order to prolong an investigative stop longer than necessary to effect the purpose of the stop absent probable cause to arrest the person or the person's consent, and/or secure arrest that lack the requisite probable cause. Such a policy routinely causes DPD officers to violate the constitutional rights of Dallas citizens, and indeed, caused such a violation here.

142.    This culture, policy and practice has even been memorialized in certain written policies. Defendant Dodson included a substantially similar false statement in her narrative when she indicated Mr. Thompson "refused to answer the question" about "if they had any firearms or

contraband in the vehicle," when in actuality, Defendant Dodson never asked him that question.

143.    Apart from these written policies, there are numerous examples of DPD officers making false statements in connection with criminal investigations, including incident reports and narratives, sufficient to demonstrate a practice and/or policy. Examples of recorded dishonesty in criminal investigations analogous to the dishonesty here include the following:

- Dallas police Sergeant in 2015 who gave testimony that wasn't true in a DWI case.

- A Dallas Police officer who responded to a street-racing call on April 1, 2011, and lying about a man striking him with a vehicle.

- A former Dallas police officer accused of lying in a criminal case report about watching a surveillance video in 2021.

- A Dallas police officer who reported that he falsified evidence in October 2021, after responding to a call about a shooting at a Motel 6.

Despite these, and many other instances of dishonest behavior, Defendant City of Dallas and its Policymakers still blindly supports DPD officers. This blind backing of officers is also apparent from evidence showing that officers who have demonstrated dishonesty in investigations are not punished.

144.    Given the numerous instances of dishonesty and lack of discipline for dishonest officers, Defendant City of Dallas, through DPD and the policymakers, has demonstrated a policy and/or practice of allowing DPD officers to submit false information in order to secure arrests without the requisite probable cause.

###           *iii.     DPD Officers Routinely Engage in Race-Based Policing*

145.    DPD officers also frequently use race in their policing, both in determining when and who to detain and what charges to pursue. For example, in the 2021 DPD Racial Profiling Analysis, traffic stops reveled that 24,747 were on a Black person, 22,775 were made of

Hispanic/Latino people, 13,512 were made on White people, and 1,021 were stopped on an Asian/Pacific Island person. In addition, of those traffic stops the number that resulted in arrest were 781 Black People, 511 were Hispanic/Latino people, 199 were White people, and only 13 were people from Asian/Pacific Islands. This data suggests that, when given the choice, DPD police are more likely to pursue criminal investigations following traffic stops against Black people than people of other races.

146.    DPD officers use race when determining whether to pursue and/or detain Black people in a manner disproportionate to their proportionate representation in the population, including on impersonation-type charges. This data is illustrative of DPD's unconstitutional race- based practices.

147.    Mr. Thompson, a black man, was victimized by these race-based practices when Defendants Dodson and Guerrero chose to pursue an investigation about his identity, when he was a passenger in a traffic stop, who had done nothing wrong. Had Defendants not been engaging in race-based policing practices, they would have respected Mr. Thompson's desire to exercise his right to remain silent and not consent to their investigation into his identity without reasonable suspicion.

### COUNT ONE – 42 U.S.C. § 1983
### VIOLATION OF FOURTH AND FOURTEENTH AMENDMENTS
**Unlawful Arrest and Prosecution Through the Wrongful Institution of Legal Process**
*(Defendants Dodson, Guerrero, and Hartger, in their individual capacities)*

148.    Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

149.    The Fourth Amendment, as incorporated and applied to the states through the Fourteenth Amendment, protects "[t]he right the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; amend. XIV. It is clearly established that the Fourth Amendment specifically protects the people's right "to be free

from police arrest without a good faith showing of probable cause." *Winfrey v. Rogers,* 901 F.3d 483, 494 (5th Cir. 2018). Such violations are actionable pursuant to 42 U.S.C. §§ 1983 and 1988.

150.    As described in the in the preceding paragraphs, Defendants Dodson, Guerrero, and Hartger (hereinafter, the "Individual Defendants"), while acting individually, jointly and in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his clearly established constitutional rights, including the right to be free from police arrest without probable cause under the Fourth and Fourteenth Amendments.

151.    At the time of Plaintiff's arrest, the Individual Defendants knew or should have known that they did not have probable cause to arrest Plaintiff on the charge of failure to identify fugitive from justice.

152.    In the manner described more fully above, the Individual Defendants conducted a reckless and unlawful prolonged traffic stop investigation, and knowingly included false statements and material omissions in the incident report used to justify Plaintiff's arrest. Absent this misconduct, the arrest and subsequent prosecution of Plaintiff could not and would not have been pursued.

153.    Additionally, and as explained more fully in the preceding paragraphs, Defendant Dodson, while acting under the color of state law, deprived Plaintiff of his clearly established rights under the Fourth Amendment, as applied to the states through the Fourteenth Amendment, by:

    a. Knowingly preparing an incident report for an arrest that contained numerous material omissions and false statements;

    b. Presenting the incident report knowing of its falsity and material omissions, yet swearing under oath to the truthfulness of its contents;

    c. Going, together with Defendant Guerrero and with the express approval of Defendant Hartger, all acting under color of law, to execute the arrest against Plaintiff and transport him to jail to be booked on the baseless charge.

154.    Each of the Individual Defendants participated in the reckless and unlawful traffic stop

investigation of Plaintiff and planned, executed and/or approved of the arrest and prosecution of Plaintiff knowing that no reasonable suspicion existed to prolong the traffic stop investigation probable cause did not exist for the charge against him. Defendant Dodson made the material omissions and false statements in the incident report and narrative at the direction of and/or in cooperation with Defendants Guerrero and Hartger, as part of their reckless and unlawful criminal investigation. Defendant Hartger expressly approved and allowed Plaintiff's arrest despite the fact that he knew and/or should have known of the material omissions and false statements in the narrative as a result of the reckless investigation.

155.    The Individual Defendants' misconduct, as described fully herein, directly resulted in the unjust arrest and criminal prosecution of Plaintiff, in violation of his rights under the Fourth and Fourteenth Amendments of the United States Constitution.

156.    Alternatively, the Individual Defendants are liable for failing to intervene in the violation of Plaintiff's rights. In the Fifth Circuit "an officer may be liable under § 1983 under a theory of bystander liability where the officer (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Hamilton v. Kindred*, 845 F.3d 659, 663 (5th Cir. 2017).

157.    Defendants Guerrero and Hartger were aware that the investigative detention of Plaintiff was lacking reasonable suspicion and that the search that was conducted on the name "Eric Thompson" took place following the unlawful prolonged traffic investigation by Defendant Dodson, and that no probable cause existed to arrest Plaintiff. Defendants also knew that Plaintiff's constitutional rights would be violated if he were to be arrested following a refual to consent to identifying himself during an unlawful detention where no reasonable suspicion existed. Defendants had an opportunity to prevent the unlawful arrest of Plaintiff by intervening

and/or refusing to approve the arrest to prevent other Defendants from violating Plaintiff's rights in the manner described above but failed to do so.

158.    Thus, the Individual Defendants violated 42 U.S.C. § 1983 by detaining Plaintiff in violation of his Fourth Amendment expectation of privacy and guarantee to security from unreasonable search and seizure without reasonable suspicion and/or probable cause and by failing to provide supervision and/or proper training, where it was necessary and/or required by law.

159.    The Individual Defendants' misconduct, as described in this Count, was objectively unreasonable in light of the facts and circumstances known to them at the time and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

160.    At the time of Individual Defendants' actions described herein, no reasonable officer or investigator with the same information could have believed that his or her actions were lawful in light of clearly established law. Therefore, the individually named Defendants are not entitled to qualified immunity.

161.    As a direct and proximate result of Defendants' misconduct and the violations of Plaintiff's constitutional rights, Plaintiff suffered a loss of liberty when he was falsely arrested and held in custody, and suffered and will continue to suffer emotional distress, embarrassment, humiliation, physical and psychological harm, pain and suffering, and financial harm, some or all of which may be permanent.

**COUNT TWO – 42 U.S.C. § 1983**
**VIOLATION OF FOURTH AMENDMENT**
**Unlawful Seizure and Arrest of a Person**
*(Defendants Dodson, Guerrero, and Hartger, in their individual capacities)*

162.    Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

163.    No right is held more sacred, or is more carefully guarded, by the common law, than the

right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law. *Terry v. Ohio*, 392 U.S. 1, 9 (1968). The Fourth Amendment applies to "seizures," and it is not necessary that a detention be a formal arrest in order to bear the requirements intended to protect against arbitrary arrests as well as against unreasonable searches. To determine whether an officer has probable cause to make a warrantless arrest, courts consider the "totality of the circumstances," examining "the events leading up to the arrest" and deciding "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to" probable cause. Some objective justification must be shown to validate all seizures of the person, including seizures that involve only a brief detention short of arrest.

164.   As described, the Individual Defendants, employees and agents of Defendant City of Dallas, were acting individually, jointly and in conspiracy, under color of law, when they unlawfully detained Plaintiff without reasonable suspicion that any violation or crime had been committed and before conducting a criminal investigation into his identity.

165.   At the time of Defendants Dodson and Guerrero chose to prolong the traffic stop, beyond the purpose of effectuating the stop, they knew they had no reasonable suspicion to justify the detention. Defendant Dodson's performance of the computer check on "Eric Thompson" was conducted well after the traffic stop investigation had concluded. Therefore, the evidence pertaining to the warrants was derived only as the direct result of illegal conduct on the part of the DPD officers.

166.   No objectively reasonable police officer would believe that Defendant Dodson and Defendant Guerrero were justified in prolonging the traffic stop without reasonable suspicion. Likewise, no reasonable officer would believe that the officers' conduct was legal when they

conducted a criminal investigation of the name shown on the ID badge inside the vehicle, when they had no reason to believe that the vehicle's passenger had done anything wrong. Still more, no justification existed in the unlawful plain view search of the badge, which was not contraband nor evidence of a crime.

167.    At the time Plaintiff was removed from his vehicle and placed in handcuffs, Defendant Dodson had not made any attempt to call into dispatch to confirm the alleged warrants. Therefore, at the time of his arrest, Defendants lacked probable cause to arrest Plaintiff.

168.    When Defendant Hartger spoke to the officers, he failed to request that Defendant Dodson and/or Defendant Guerrero point to concrete details, circumstances, or evidence that gave rise to their suspicion of Plaintiff, other than him asserting his constitutional rights to remain silent and refuses to identify himself when no reasonable suspicion existed.  Instead, he advised Mr. Thompson that his officers were justified in their investigation, which lacked reasonable suspicion, because they had a mere hunch based on "people with warrants in the area."

169.    At the moment the officers removed the Plaintiff from the vehicle and placed him in handcuffs, he reasonably believed that he was not free to leave. The seizure occurred following the unlawful detention and investigation by Defendants Dodson and Guerrero.

170.    The Individual Defendants seizure of Plaintiff was the result of conducted a reckless and unlawful prolonged traffic stop investigation. Absent this misconduct, the arrest and subsequent prosecution of Plaintiff could not and would not have been seized.

171.    The totality of the circumstances prior to the arrest reveal that the Individual Defendants' misconduct, as described fully herein, directly resulted in the unjust seizure and arrest of Plaintiff. Those actions violated Plaintiff's rights to due process, to equal protection, give rise to Plaintiff's

claims pursuant to the Fourth Amendment to the Constitution of the United States and 42. U.S.C. § 1983, and their counterparts in the Texas Constitution.

172.    Thus, the Individual Defendants violated 42 U.S.C. § 1983 by unreasonably seizing Plaintiff in violation of his Fourth Amendment guarantee to security from unreasonable search and seizure without reasonable suspicion and/or probable cause and by failing to provide supervision and/or proper training, where it was necessary and/or required by law.

173.    As a direct and proximate result of Defendants' misconduct and the violations of Plaintiff's constitutional rights, Plaintiff suffered a loss of liberty when he was falsely arrested and held in custody, and suffered and will continue to suffer emotional distress, embarrassment, humiliation, physical and psychological harm, pain and suffering, and financial harm, some or all of which may be permanent.

**COUNT THREE – 42 U.S.C. § 1983**
**VIOLATION OF FOURTEENTH AMENDMENT**
**Violation of Procedural Due Process for Filing False Report**
*(Defendant Dodson, in her individual capacity)*

174.    Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

175.    Defendant Dodson knowingly provided a false report to law enforcement and the Dallas County District Attorney's Office regarding the incident. But for the false report, Plaintiff would not have been criminally charged. *See e.g. Cole v. Carson*, 802 F.3d 752 (5th Cir. 2015), *vacated on other grounds sub nom*., *Hunter v. Cole*, 137 S.Ct. 497 (2016).

176.    An objectively reasonable police officer would have known that providing a false statement to law enforcement for the purpose of causing a continued detention and unlawful arrest, would violate clearly established law.

177.    As a result of Defendant Dodson's fabrication of evidence, Plaintiff was arrested and

charged with failure to identify fugitive from justice, a Class B misdemeanor punishable by up to 180 days in jail, a fine of as much as $2,000, or both. Plaintiff spent six (6) days in jail, housed in the mental health unit of the Lew Sterrett Justice Center without reason, lost his new job while in custody, his living circumstances were diminished, and his life has been in a downward spiral ever since the unlawful detention and investigation that led to the meritless charge he faced which were based on the fabricated evidence of Defendant Dodson.

178.    On March 32, 2022, the charges against Plaintiff were dismissed in the interest of justice.

179.    Defendant Dodson was at all times acting under the color of law.

180.    As a direct and proximate result of Defendant Dodson's conduct, Plaintiff suffered a loss of liberty when he was falsely arrested and held in custody, and suffered and will continue to suffer emotional distress, embarrassment, humiliation, physical and psychological harm, pain and suffering, and financial harm, some or all of which may be permanent.

### COUNT FOUR– 42 U.S.C. § 1983
### VIOLATION OF FOURTH AND FOURTEENTH AMENDMENT
**Failure to Supervise**
*(Defendant Hartger, in his individual capacity)*

181.    Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

182.    In a 1983 claim for failure to supervise or train, the plaintiff must show that: "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Goodman v. Harris Cty*., 571 F.3d 388, 395 (5th Cir. 2009) (quoting *Smith v. Brenoettsy*, 158 F.3d 908, 911–12 (5th Cir.1998).

183.    "For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. (quoting *Smith*, 158 F.3d at 912.).

184.    An official's actual knowledge of a substantial risk may only be inferred if the "substantial risk" was obvious. *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006).

185.    Defendant Hartger's failure to supervise Defendants Dodson and Guerrero caused a violation of Plaintiff's constitutional rights under the Fourteenth and Fourth Amendments.

186.    Defendant Hartger was responsible for supervising the actions of Defendants Dodson and Guerrero pursuant to DPD policy.

187.    Had Defendant Hartger been properly supervising Defendants Dodson and Guerrero, he would have noticed the failure of Defendants Dodson and Guerrero to properly investigate the traffic stop and the prolonged investigation that lacked reasonable suspicion, the discrepancies between the incident report, and the available evidence. Viewing any of these red flags should have caused the investigation into Plaintiff to be more thoroughly reviewed, and the lack of reasonable suspicion for the continued detention following a traffic stop that resulted in an unlawful investigation of Plaintiff's identity would have been discovered prior to his arrest and subsequent prosecution.

188.    Furthermore, had Defendant Hartger been properly supervising Defendants Dodson and Guerrero, he would've reviewed their work in support of the arrest, prior to approving the arrest of Plaintiff. Had he done so, he would've noticed the discrepancies between the incident report and narrative supplied by Defendant Dodson and the timeline of events and questions, and would have determined that reasonable suspension did not exist to allow the officers to investigate the identify

of the Plaintiff, which was the fruit of the poisonous tree in obtaining probable cause for the arrest, which would have prevented Plaintiff from being falsely arrested and prosecuted.

189.    Thus, Defendant Hartger's failure to supervise Defendants Dodson and Guerrero directly caused Plaintiff's constitutional violations from being falsely arrested and maliciously prosecuted under the Fourth Amendment to the United States Constitution.

190.    Defendant Hartger was at all times acting under the color of law.

191.    As a direct and proximate result of Defendant Hartger's conduct, Plaintiff suffered a loss of liberty when he was falsely arrested and held in custody, and suffered and will continue to suffer emotional distress, embarrassment, humiliation, physical and psychological harm, pain and suffering, and financial harm, some or all of which may be permanent.

**COUNT FIVE– 42 U.S.C. § 1983**
**MUNICIPAL LIABILITY**
**Constitutional Deprivation through Policy, Custom or Practice**
*(Defendants City of Dallas)*

192.    Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

193.    Local governing bodies, or municipalities, may be held liable under 42 U.S.C.§1983 for constitutional deprivations committed pursuant to a policy, custom, or practice of the municipality. Even absent an officially adopted policy, a custom or practice that is so persistent and widespread that it fairly represents a municipal policy will support liability against the municipality. A pattern of unconstitutional conduct may be shown on the part of municipal employees who are not Policymakers.

194.    In addition, a failure to train may give rise to municipal liability if the failure to train amounts to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Canton v. Harris*, 489 U.S. 378, 388 (1989).

195.    Defendant City of Dallas knowingly failed to maintain policies, practices, and training

that met the minimum standards in the industry.

196.   At all times relevant to this action, Defendant City of Dallas has maintained policies, customs and/or practices that caused and were the moving force behind the violation of Plaintiff's constitutional rights, as described in this Complaint.

197.   The acts and/or omissions of each Individual Defendant was caused by said policies, customs or practices.

198.   The policymakers for Defendants City of Dallas and DPD had actual or constructive knowledge about said policies, customs or practices and/or were deliberately indifferent as to said policies, customs or practices.

    1.   Said policies, customs and practices include the following:

      a.   Defendant City of Dallas' policy of failing to sufficiently enforce respect of a civilian's constitutional rights during traffic stops;

      b.   Defendant City of Dallas' failure to train DPD officers on proper traffic stop investigations and/or the need for reasonable suspicion to prolong a traffic stop;

      c.   Defendant City of Dallas' policy or custom of allowing DPD officers to misrepresent facts in a criminal investigation for personal gain and use false statements, including incident reports, without sufficient justification;

      d.   Defendant City of Dallas' policy or custom of allowing DPD officers to violate policies related to criminal investigations and collection/reporting of evidence;

      e.   Defendant City of Dallas' policy or custom of allowing DPD officers to engage in race-based policing, specifically by disproportionately targeting black people for arrest and prosecution of certain crimes, including failure to identify;

      f.   Defendant City of Dallas' written policies that encourage DPD officers to manipulate investigations and the presentation of evidence in order to secure arrest without the requisite probable cause;

      g.   Defendant City of Dallas' failure to train DPD officers on how to work together to conduct a proper criminal investigation, as opposed to cherry-picking facts to support probable cause;

199.    Defendant City of Dallas, through their policymakers, had actual or constructive knowledge about, but were deliberately indifferent to, all of the policies, customs, and practices of DPD referenced in this Complaint. All such policies, customs, and practices were the moving force behind, and cause of, the deprivation of Plaintiff's constitutional rights and resulting damages.

200.    The conduct of each Individual Defendant as described in this Complaint was caused by said policies, customs, and practices.

201.    As a direct and proximate result of Defendants' misconduct and the violations of Plaintiff's constitutional rights, Plaintiff suffered a loss of liberty when he was falsely arrested and held in custody, and suffered and will continue to suffer emotional distress, embarrassment, humiliation, physical and psychological harm, pain and suffering, and financial harm, some or all of which may be permanent.

### COUNT SIX– 42 U.S.C. § 1983
### VIOLATION OF THE FOURTH AMENDMENT
**Malicious Criminal Prosecution**
*(Defendants Dodson, Guerrero, and Hartger, in their individual capacity)*

202.    Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

203.    The Fourth Amendment prohibits unreasonable seizures pursuant to legal process, sometimes referred to as malicious prosecution. Malicious prosecution is actionable as a Fourth Amendment violation to the extent that the Defendant's actions cause the Plaintiff to be seized without probable cause, if the Plaintiff proves the favorable termination of the underlying criminal case against him.

204.    The Individual Defendants each played a role in having the criminal prosecution for failure to identify fugitive from justice, commenced against Mr. Thompson on August 13, 2021.

205.    Defendants Dodson and Guerrero acts of conducting an unlawful criminal investigation

of Plaintiff's identity, without reasonable suspicion, initiated or procured the prosecution. Defendant Hartger's refusal to properly investigate the actions of the officers and justifying their investigation of Plaintiff based on a mere hunch, aided in the prosecution of Plaintiff.

206.    The criminal complaint contained allegations that:

> "On or about the 13th day of August 2021, did then and there intentionally **_give_** a false and fictitious name, residence address, and date of birth to I. DODSON, whom defendant knew was a peace officer for the City of DALLAS, County of Dallas, State of Texas, **_who had lawfully arrested said defendant_** and **_lawfully detained said defendant_**." **_(emphasis added)_**

207.    As described fully herein, at no time did Plaintiff ever **_give_** any name, address, nor date of birth. This was true of every portion of his encounter with Defendant Dodson from the moment she pulled over the vehicle, conducted an unlawful investigation of Plaintiff without reasonable suspicion, arrested Plaintiff, and the ride to jail.

206.    After the Plaintiff was held in custody for six (6) days, between August 13, 2021, and August 19, 2021, before being released on a personal recognizance bond. For 230 days, this criminal charge lingered over Plaintiff's head, until March 31, 2022, when the State of Texas' Motion to Dismiss the charges against Plaintiff was signed in the interest of justice. As such, the prosecution was terminated in Plaintiff's favor.

208.    Any reasonable law enforcement officer would agree that Plaintiff was innocent of the charge for failure to identify fugitive from justice, as the evidence of the warrants was only obtained following the unlawful prolong detention in a traffic stop. Prior to the unlawful investigation no reasonable suspicion existed that would have required Mr. Thompson to identify himself as a passenger in the vehicle. Thus, Defendants did not have probable cause for the arrest as it is it abundantly clear that he was in-fact innocent of the charge.

209.    Defendants, especially Defendant Dodson, acted with malice. Defendant Dodson knew

that Plaintiff did not commit the crime of failure to identify fugitive from justice, but arrested Mr. Thompson in retaliation of him practicing his constitutional rights and "not listening" to her. Her laughter when she told her colleagues, "I get to do the report for this one!" followed by the false statements and omissions made in the incident report are evidence her ill-will towards Plaintiff for refusing to comply with her unlawful investigation during a traffic stop.

210.    Plaintiff suffered damages as a result of the prosecution, including humiliation, shame, fright, mental anguish, loss of past wage earning capacity, injury to reputation, and loss of personal property.

211.    The acts of the aforenamed Defendants were intentional, wanton, malicious, and oppressive, entitling Plaintiff to an award of punitive damages.

## DAMAGES

212.    As a result of the foregoing unlawful and wrongful acts of Defendants, jointly and severally, Mr. Thompson suffered anxiety, fear, anger, and depression, and therefore, Mr. Thompson seeks general damages which include, but are not limited to, the following: both physical and emotional injury, pain and suffering, and emotional and mental distress, and shock, past and future.

213.    Said injuries have caused Plaintiff to incur special damages which include but are not limited to: lost wages, medical expenses, and attorney's fees.

214.    Pursuant to the Civil Rights Attorney's Fees Award Act, 42 U.S.C.S. §1988, a prevailing party in a §1983 case is entitled to recover its attorney's fees. Hence, Plaintiff further prays for all costs and attorney fees associated with bringing the present case to trial. In addition, Plaintiff prays for punitive damages against the individual Defendants.

215.    Punitive damages are designed to punish and deter persons such as the individual

Defendants who have engaged in egregious wrongdoing. Punitive damages may be assessed under §1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.

216.    When viewed objectively from the standpoint of the Defendants, at the time of the occurrence, said Defendants' conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others. The Defendants' actions and inactions cause them to be liable for punitive damages as they were consciously indifferent to the Plaintiff's constitutional rights and they did the acts knowingly, such acts being extreme and outrageous and shocking to the conscience.

217.    As a direct, proximate, and producing cause and the intentional, egregious, malicious conduct by Defendants, Plaintiff is entitled to recover exemplary and/or punitive damages in an amount within the jurisdictional limits of this Court.

## **JURY DEMAND**

218.    Plaintiff hereby demands a trial by jury on all issues so triable.

## **PRAYER**

WHEREFORE, premises considered, Plaintiff Eric Dwayne Thompson requests that Defendants, be found liable as set forth above, that a judgment be entered against them, and that Plaintiff be awarded all remedies to which he is entitled under law, including:

a.    An order declaring that Defendants violated Mr. Thompson's civil rights;

b.    Actual and compensatory damages against all defendants, both jointly and severally, in an amount proved at trial;

c.    Punitive damages against Defendant sufficient to punish them and to deter further wrongdoing;

d.    Cost of court;

e.     Attorneys' fees;

f.     Pre-judgment interest at the legal rate;

g.     Post-judgment interest at the legal rate;

h.     Such other and further relief, both general and special, at law and in equity, to which Plaintiff is justly entitled.

Respectfully submitted this 15th day of June, 2024,

THE LAW OFFICE OF TARYN WALKER, PLLC

By: _____
        Taryn N. Walker
        State Bar No. 24102622
P.O. Box 5126
Dallas, Texas 75208
Telephone:     (469) 656- 8835
Facsimile:     (469) 656-3993
attorney@tnwlegal.com

**ATTORNEY FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

This is to certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on this the 16th day of June, 2024.

_____
Taryn N. Walker