IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ERIC DWAYNE THOMPSON,        §
                            §
        Plaintiff,          §
                            §
V.                          §        No. 3:23-cv-2056-L
                            §
CITY OF DALLAS, ET AL.,      §
                            §
        Defendants.         §

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

Through an amended complaint, Plaintiff Eric Dwayne Thompson brings claims under 42 U.S.C. § 1983 for alleged violations of the Constitution against Defendant City of Dallas and three of its police officers, Defendants Ivory R. Dodson, Thomas Guerrero, and Brian J. Hartger, based on an August 13, 2021 traffic stop that led to Thompson's arrest (and subsequent charges that were dismissed). *See* Dkt. No. 16.

The City moved to dismiss the amended complaint under Federal Rule of Civil Procedure 12(b)(6) on July 17, 2024. *See* Dkt. No. 20.

One week later, United States District Judge Sam A. Lindsay referred the motion to dismiss to the undersigned United States magistrate judge for hearing, if necessary, and for recommendation under 28 U.S.C. § 636(b). *See* Dkt. No. 24.

And, since then, neither a response nor a reply brief was filed, and the time to do so has expired. *See* N.D. TEX. L. CIV. R. 7.1.

The undersigned now enters these findings of fact, conclusions of law, and

recommendation that the Court should grant the motion to dismiss.

## Legal Standards

In deciding a motion to dismiss for failure to state a claim on which relief may be granted under Rule 12(b)(6), the Court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205-06 (5th Cir. 2007).

Even so, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and must plead those facts with enough specificity "to raise a right to relief above the speculative level," *id.* at 555.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). *Cf. Bryant v. Ditech Fin., L.L.C.*, No. 23-10416, 2024 WL 890122, at *3 (5th Cir. Mar. 1, 2024) ("[J]ust as plaintiffs cannot state a claim using speculation, defendants cannot defeat plausible inferences using speculation.").

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. So, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (cleaned up; quoting *Twombly*, 550 U.S. at 557); *see, e.g.*, *Parker v. Landry*, 935 F.3d 9, 17 (1st Cir. 2019) (Where "a complaint reveals random

puffs of smoke but nothing resembling real signs of fire, the plausibility standard is not satisfied.").

And, while Federal Rule of Civil Procedure 8(a)(2) does not mandate detailed factual allegations, it does require that a plaintiff allege more than labels and conclusions. So, while a court must accept a plaintiff's factual allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

Consequently, a threadbare or formulaic recitation of the elements of a cause of action, supported by mere conclusory statements, will not suffice. *See id.*; *Armstrong v. Ashley*, 60 F.4th 262, 269 (5th Cir. 2023) ("[T]he court does not 'presume true a number of categories of statements, including legal conclusions; mere labels; threadbare recitals of the elements of a cause of action; conclusory statements; and naked assertions devoid of further factual enhancement.'" (quoting *Harmon v. City of Arlington, Tex.*, 16 F.4th 1159, 1162-63 (5th Cir. 2021))).

And, so, "to survive a motion to dismiss" under *Twombly* and *Iqbal*, plaintiffs must "plead facts sufficient to show" that the claims asserted have "substantive plausibility" by stating "simply, concisely, and directly events" that they contend entitle them to relief. *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 12 (2014) (per curiam) (citing FED. R. CIV. P. 8(a)(2)-(3), (d)(1), (e)).

"Municipalities can be held liable for violating a person's constitutional rights under [42 U.S.C.] § 1983." *Sanchez v. Young Cnty., Tex.*, 956 F.3d 785, 791 (5th Cir. 2020) ("*Sanchez II*") (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)).

And the general pleading standards set out above apply to a claim against a municipality. *See Hutcheson v. Dall. Cnty., Tex.*, 994 F.3d 477, 482 (5th Cir. 2021) ("There is no heightened pleading standard for § 1983 claims against municipalities. To survive a motion to dismiss, the complaint need not contain detailed factual allegations but still must state sufficient facts to establish a plausible claim on its face." (citing *Littell v. Hous. Indep. Sch. Dist.*, 894 F.3d 616, 622 (5th Cir. 2018))).

But, because "[a] person may sue a municipality that violates his or her constitutional rights [only] 'under color of any statute, ordinance, regulation, custom, or usage,'" *id.* (quoting Section 1983; citing *Monell*, 436 U.S. at 690), a plaintiff alleging a *Monell* claim "has two burdens: to [plausibly allege] (1) that a constitutional violation occurred and (2) that a municipal policy was the moving force behind the violation," *Sanchez II*, 956 F.3d at 791 (citing *Monell*, 436 U.S. at 694); *see also Cope v. Coleman Cnty.*, No. 23-10414, 2024 WL 3177781, at *3 (5th Cir. June 26, 2024) (per curiam) ("A municipality may be held liable for a constitutional violation 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'" (quoting *Monell*, 436 U.S. at 694)).

To plausibly allege that a policy was the moving force,

a plaintiff must identify "(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy (or custom)." *Pineda v. City of Hous.*, 291 F.3d 325, 328 (5th Cir. 2002) (cleaned up). Municipalities are not liable "on the theory of respondeat superior" and are "almost never liable for an isolated unconstitutional act on the part of an employee." *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009).

*Hutcheson*, 994 F.3d at 482.

These elements are "necessary to distinguish individual violations perpetrated by local government employees from those that can be fairly identified as actions of the government itself." *Piotrowski v. City of Hous.*, 237 F.3d 567, 578 (5th Cir. 2001).

And, where a plaintiff's claim fails as to one prong, a court "need not consider whether [his] claim also fails the other two *Monell* prongs." *Brown v. Tarrant Cnty., Tex.*, 985 F.3d 489, 497 & n.11 (5th Cir. 2021) (citing *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 168-69 (5th Cir. 2010)).

"Official policy can arise in various forms. It usually exists in the form of written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice that is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *James v. Harris Cnty.*, 577 F.3d 612, 617 (5th Cir. 2009) (citations omitted). And, in rare circumstances, "a single decision by a policymaker may … constitute a policy for which a municipality may be liable," where (1) the "decision was made by a final policymaker, and (2) a plainly obvious consequence of the decision is a constitutional violation." *Doe v. Englewood Indep. Sch. Dist.*, 964 F.3d 351, 366 (5th Cir. 2020) (cleaned up); *see also Johnson v. Harris Cnty.*, 83 F.4th 941, 946 (5th Cir. 2023) ("[A]n official policy includes the decisions of a government's law-makers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." (cleaned up)).

"Under the second requirement, a plaintiff must show '[a]ctual or constructive knowledge of [a] custom' that is 'attributable to the governing body of the

municipality or to an official to whom that body ha[s] delegated policy-making authority.'" *Allen v. Hays*, 65 F.4th 736, 749 (5th Cir. 2023) (citation omitted).

A plaintiff must then "allege 'moving force' causation by showing first, 'that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.'" *Id.* (citation omitted).

As to the causation required, "[t]his connection must be more than a mere 'but for' coupling between cause and effect." *Fraire v. City of Arlington*, 957 F.2d 1268, 1281 (5th Cir. 1992) (footnote omitted). That is, the "moving force" is the "catalyst" for the injury in question, not merely a "contributing factor." *Johnson v. Cook Cnty.*, 526 F. App'x 692, 695-96 (7th Cir. 2013) (per curiam).

"[T]he failure to provide proper training [or supervision] may fairly be said to represent a policy for which the [municipality] is responsible, and for which [it] may be held liable if it actually causes injury." *Shumpert v. City of Tupelo*, 905 F.3d 310, 317 (5th Cir. 2019) (citation omitted). And, although "a separate theory of municipal liability," "the same standard applies both to a failure to train [or to supervise] claim and to a municipal liability claim." *Pinedo v. City of Dall., Tex.*, No. 3:14-cv-958-D, 2015 WL 5021393, at *9 (N.D. Tex. Aug. 25, 2015) (citations omitted).

"The ratification theory provides another way of holding a city liable under § 1983" but only "if the policymaker approves a subordinate's decision and the basis for it, as this 'ratification' renders the subordinate's decision a final decision by the policymaker." *Allen*, 65 F.4th at 749 (footnote omitted).

But "a policymaker who defends conduct that is later shown to be unlawful does not necessarily incur liability on behalf of the municipality." *Peterson*, 588 F.3d at 849 (citation omitted).

This theory is also "limited to 'extreme factual situations,'" such that conduct may be unconstitutional but "not sufficiently extreme to qualify for a finding of ratification." *Davidson v. City of Stafford, Tex.*, 848 F.3d 384, 395-96 (5th Cir. 2017) (citations omitted)).

And, regardless the theory of municipal liability, "[t]o proceed beyond the pleading stage, a complaint's 'description of a policy or custom and its relationship to the underlying constitutional violation ... cannot be conclusory; it must contain specific facts.'" *Peña v. City of Rio Grande City*, 879 F.3d 613, 622 (5th Cir. 2018) (citation and footnote omitted).

That is because "[t]he causal link 'moving force' requirement and the degree of culpability 'deliberate indifference' requirement must not be diluted, for 'where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability.'" *Alvarez v. City of Brownsville*, 904 F.3d 382, 390 (5th Cir. 2018) (en banc) (quoting *Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir. 1998) (quoting, in turn, *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 415 (1997))).

## Analysis

Even if Thompson plausibly alleges a constitutional violation, he fails to plausibly allege that an official policy of the City of Dallas was the moving force

behind any such violation.

That is, although Thompson alleges in detail the events underlying his August 13 traffic stop and arrest, allegations "limited to the events surrounding the plaintiff" himself cannot constitute "an allegation of a *de facto* policy." *Culbertson v. Lykos*, 790 F.3d 608, 629 (5th Cir. 2015); *accord Hutcheson*, 994 F.3d at 482.

> [Instead, a] plaintiff can establish a policy by pointing to similar incidents that are sufficiently numerous and have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees. That knowledge, coupled with a failure to act, can show the existence of a municipal policy.

*Robinson v. Midland Cnty., Tex.*, 80 F.4th 704, 710 (5th Cir. 2023) (cleaned up); *see also Johnson*, 83 F.4th at 947 ("Johnson's claim against the county fails because she does not plausibly allege *any* pattern of conduct – much less a pattern of similar violations." (emphasis in original)).

And, while Thompson does devote several paragraphs in the lengthy amended complaint to alleged policies of the City, *see* Dkt. No. 16, ¶¶ 132-47, for the reasons set out below, these allegations do not raise a reasonable inference that an official municipal policy was the moving force behind a constitutional violation.

Thompson first alleges that he "was unlawfully arrested as a result of several faulty customs, policies and/or practices at the City of Dallas and DPD," namely the City's "failing to enforce the need for reasonable suspicion to prolong a traffic stop"; the City's "condoning dishonesty in DPD investigations and incident reports"; and that "DPD officers routinely engage in race-based policing." *Id.* (caps omitted).

Under these three headings, Thompson then specifically alleges:

DPD has a longstanding policy, practice, and/or custom of officers failing to have justification to prolong the investigative detention of occupants in a motor vehicle following a traffic stop, once the traffic stop investigation is fully resolved.

Although DPD and the policymakers have kept the total numbers confidential, there have been numerous internal affairs investigations related to DPD officers themselves refusing to cooperate with other officers when they have been pulled over for a traffic stop, as well as, DPD Officers arresting civilians in traffic stops and then lying about the circumstances.

However, despite acknowledging the seriousness of the problem, DPD and the policymakers continue to contribute to the lack of justifying prolong detentions in traffic stops [ ] and have failed to implement proper training, procedures, and enforcement mechanisms to curb the incidence of unlawful traffic stop investigative detentions. The policy, practice, and culture of failing to responsibly enforce laws against unlawfully detaining occupants in a traffic stop longer than necessary to complete the mission of issuing a ticket, directly caused the violation of Mr. Thompson's constitutional rights.

Due to Defendants Dodson, Guerrero, and Hartger's nonchalance of Plaintiff's clear right to remain silent and refuse to identify himself when no reasonable suspicion existed, they shifted their focused onto finding any reason to arrest Mr. Thompson. Thus, the failure to honor Plaintiff's constitutional rights, directly led to the unlawful investigation of Mr. Thompson's identity and subsequent findings of the four (4) traffic warrants.

Additionally, none of the Defendants were not [sic] disciplined for their failure to properly investigate, conclude the traffic stop, and not prolong a traffic stop unless they are able to point to specific articulable facts, contrary to DPD's written policy, which demonstrates a ratification of their actions by DPD, City of Dallas, and the Policymakers.

By taking the steps necessary to let the officers know he did not want to answer their questions, nor identify himself, when no reasonable suspicion existed, Mr. Thompson was merely exercising the rights afforded to him by the constitution. Defendants' decision to punish him for these actions was a direct result of the culture of DPD, City of Dallas, and the Policymakers' lax attitude towards unlawful detentions and investigation offenses.

Defendant City of Dallas and the policymakers also have long maintained a custom, policy and/or practice that condones dishonesty in criminal investigations, incident reports, and officer narratives.

Not only did Defendant City of Dallas have a longstanding practice of mishandling and lying about prolong[ed] investigations

during traffic stops, Defendant City of Dallas has also maintained a custom, policy and/or practice that allows and approves of DPD officers making material omissions and false statements in criminal investigations generally, including in incident reports and officer narratives when reasonable suspicion to prolong the stop does not actually exist.

More egregious, when confronted with instances of officer misconduct involving dishonesty in incident reports – Defendant City of Dallas has a custom of failing to appropriately punish the offending officer and downplays the seriousness of the conduct. Defendant City of Dallas' practice of turning a blind eye towards dishonesty in policing fosters an environment where DPD officers are encouraged and/or feel comfortable in continuing to make false statements and material omissions in incident reports and narratives in order to prolong an investigative stop longer than necessary to effect the purpose of the stop absent probable cause to arrest the person or the person's consent, and/or secure arrest that lack the requisite probable cause. Such a policy routinely causes DPD officers to violate the constitutional rights of Dallas citizens, and indeed, caused such a violation here.

This culture, policy and practice has even been memorialized in certain written policies. Defendant Dodson included a substantially similar false statement in her narrative when she indicated Mr. Thompson "refused to answer the question" about "if they had any firearms or contraband in the vehicle," when in actuality, Defendant Dodson never asked him that question.

Apart from these written policies, there are numerous examples of DPD officers making false statements in connection with criminal investigations, including incident reports and narratives, sufficient to demonstrate a practice and/or policy. Examples of recorded dishonesty in criminal investigations analogous to the dishonesty here include the following:

- Dallas police Sergeant in 2015 who gave testimony that wasn't true in a DWI case.
- A Dallas Police officer who responded to a street-racing call on April 1, 2011, and lying about a man striking him with a vehicle.
- A former Dallas police officer accused of lying in a criminal case report about watching a surveillance video in 2021.
- A Dallas police officer who reported that he falsified evidence in October 2021, after responding to a call about a shooting at a Motel 6.

Despite these, and many other instances of dishonest behavior, Defendant City of Dallas and its Policymakers still blindly supports DPD officers. This blind backing of officers is also apparent from

evidence showing that officers who have demonstrated dishonesty in investigations are not punished.

Given the numerous instances of dishonesty and lack of discipline for dishonest officers, Defendant City of Dallas, through DPD and the policymakers, has demonstrated a policy and/or practice of allowing DPD officers to submit false information in order to secure arrests without the requisite probable cause.

DPD officers also frequently use race in their policing, both in determining when and who to detain and what charges to pursue. For example, in the 2021 DPD Racial Profiling Analysis, traffic stops [revealed] that 24,747 were on a Black person, 22,775 were made of Hispanic/Latino people, 13,512 were made on White people, and 1,021 were stopped on an Asian/Pacific Island person. In addition, of those traffic stops the number that resulted in arrest were 781 Black People, 511 were Hispanic/Latino people, 199 were White people, and only 13 were people from Asian/Pacific Islands. This data suggests that, when given the choice, DPD police are more likely to pursue criminal investigations following traffic stops against Black people than people of other races.

DPD officers use race when determining whether to pursue and/or detain Black people in a manner disproportionate to their proportionate representation in the population, including on impersonation-type charges. This data is illustrative of DPD's unconstitutional race-based practices.

Mr. Thompson, a black man, was victimized by these race-based practices when Defendants Dodson and Guerrero chose to pursue an investigation about his identity, when he was a passenger in a traffic stop, who had done nothing wrong. Had Defendants not been engaging in race-based policing practices, they would have respected Mr. Thompson's desire to exercise his right to remain silent and not consent to their investigation into his identity without reasonable suspicion.

*Id.*, ¶¶ 133-47.

Starting with the first of *Monell*'s three prongs, the amended complaint fails to plausibly allege an official policy.

As set out above, an official policy "usually exists in the form of written policy statements, ordinances, or regulations." *James*, 577 F.3d at 617. "An official, written policy is 'itself' unconstitutional only if it affirmatively allows or compels unconstitutional conduct." *Edwards v. Balch Springs, Tex.*, 70 F.4th 302, 309 (5th

Cir. 2023) (footnote omitted). And, so, "where such an official, written policy merely commits some decisions to an individual officer's on-the-scene discretion, or gives some detailed instructions while omitting others, then that policy satisfies *Monell*'s moving-force element only if those features stem from the policymaker's deliberate indifference." *Id.*

Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410.

"Establishing deliberate indifference generally requires a 'pattern of similar violations' arising from a policy 'so clearly inadequate as to be obviously likely to result in a constitutional violation.'" *Convington v. City of Madisonville, Tex.*, 812 F. App'x 219, 225 (5th Cir. 2020) (cleaned up; quoting *Burge v. St. Tammany Par.*, 336 F.3d 363, 370 (5th Cir. 2003)).

Similarly, "[a] city cannot be liable for an unwritten custom unless '[a]ctual or constructive knowledge of such custom' is attributable to a city policymaker." *Peña*, 879 F.3d at 623 (quoting *Hicks-Fields v. Harris Cnty., Tex.*, 860 F.3d 803, 808 (5th Cir. 2017)); *see also Robinson*, 80 F.4th at 711 ("[P]laintiffs' theory hinges entirely on the idea that if enough individuals do something, it becomes the fault of the policymaker. [But w]ithout a showing of knowledge and acquiescence, such a theory is no more than vicarious liability and cannot survive a motion to dismiss." (citation omitted)).

"To establish a custom, a plaintiff must demonstrate (and, at the pleading

stage, must plausibly plead) 'a pattern of abuses that transcends the error made in a single case.'" *Pinedo*, 2015 WL 5021393, at *5 (quoting *Piotrowski*, 237 F.3d at 582).

A pattern requires "sufficiently numerous incidents," as opposed to "isolated instances." *McConney v. City of Hous.*, 863 F.2d 1180, 1184 (5th Cir. 1989) (cleaned up).

That is, "[w]here prior incidents are used to prove a pattern, they must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees." *Peterson*, 588 F.3d at 850 (cleaned up).

And "[p]rior indications cannot simply be for any and all 'bad' or unwise acts, but rather, notice of a pattern of [fairly] similar violations is required." *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005) (cleaned up).

Here, Thompson does not allege a specific written official policy promulgated by the City's policymaker and instead relies on what he alleges are widespread practices or customs.

But the facts alleged – the prior incidents cited in the amended complaint, *see* Dkt. No. 16, ¶ 143 (four incidents, over a ten-year period, of "recorded dishonesty in criminal investigations analogous to the dishonesty" that Thompson alleges) – do not allow the Court to reasonably infer that a widespread pattern of fairly similar violations exists, such "that the course of conduct warrants the attribution to the [City's] governing body of knowledge that the objectionable conduct is the expected,

accepted practice of city employees." *Webster v. City of Hous.*, 735 F.2d 838, 842 (5th Cir. 1984) (en banc) (per curiam); *see, e.g.*, *Montgomery v. Hollins*, No. 3:18-cv-1954-M-BN, 2019 WL 2424053, at *6 (N.D. Tex. May 8, 2019) ("Montgomery has pointed to only 17 specific instances of force or assault by a Dallas officer that occurred prior to the events alleged in the amended complaint – from as early as 1991 to as recent as August 2015. But, given the size of the Dallas police force, these allegations do not plausibly allege 'a pattern of abuses that transcends the error made in a single case.' *Piotrowski*, 237 F.3d at 582; *see Moreno v. City of Dallas*, No. 3:13-cv-4106-B, 2015 WL 3890467, at *9 (N.D. Tex. June 18, 2015) ('Although Plaintiff has pointed to eight instances, over the course of five years, in which an officer wounded or killed an individual, these allegations do not support an inference of a pattern of abuses that can be distinguished from mere isolated incidents. In view of the size of the Dallas Police Department, and bearing in mind courts' prior holdings in similar cases, facts suggesting an average of less than two incidents of excessive force per year over the course of five years are not sufficient to indicate a pattern of abuses, especially without any further context from Plaintiff.' (citations omitted)); *Pinedo*, 2015 WL 5021393, at *7 ('Although Pinedo has alleged that 25 shootings of unarmed individuals occurred over a period of six years, he has only pleaded factual details concerning ten of them. Even if the court assumes arguendo that all ten present factual circumstances that are similar to the facts of the instant case, ten incidents occurring over a six-year period in a city the size of Dallas – on average, about 1½ per year-are numerically insufficient to support an inference of a persistent and

widespread practice of the use of excessive force.' (citation omitted)); *see also Peterson*, 588 F.3d at 851 & n.4 (as to the Fort Worth Police Department, '[t]wenty-seven [complaints of excessive force] in four years, with no context as to the overall number of arrests or any comparisons to other cities, is not sufficient evidence of a pattern rising to the level of a policy').")*, rec. accepted*, 2019 WL 2422493 (N.D. Tex. June 10, 2019).

And, to the extent that Thompson relies on statistics to prove a pattern of incidents fairly similar to the alleged constitutional violations here, *see* Dkt. No. 16, ¶ 145, Thompson fails to tie those statistics to "numerous past cases of [allegedly similar constitutional violations]," and, so, the statistics alone do not plausibly plead an official policy or provide notice of a widespread pattern of fairly similar violations, *Sanchez v. Gomez*, 283 F. Supp. 3d 524, 536-37 (W.D. Tex. 2017) ("[C]ourts have found that a path to properly pleading a widespread pattern or practice, while narrow, does exist. In *Flanagan v. City of Dallas*, the court held that plaintiffs pleaded sufficient facts to state a *Monell* claim for excessive deadly force where plaintiffs pleaded a combination of statistics, past incidents, and statements by city officials. 48 F. Supp. 3d 941, 953 (N.D. Tex. 2014).… [Here, t]he statistics combined with the numerous past cases of excessive force in similar circumstances to those involved in the present case − followed by the repeated denial of wrongdoing − lead to a reasonable and plausible inference that excessive force against the mentally ill in El Paso is a widespread practice." (citation omitted)).

Next, although Thompson identifies alleged policymakers for the City, *see* Dkt.

No. 16, ¶ 2 ("the Dallas City Counsel, Mayor Eric Johnson, and Chief of Police Eddie [Garcia] (collectively 'Policymakers')"), a complaint need "not specifically identify [the municipality's] policymaker," *Balle v. Nueces Cnty., Tex.*, 952 F.3d 552, 559 (5th Cir. 2017), because that identity "is a question of state law," and "courts should not grant motions to dismiss § 1983 cases 'for imperfect statement of the legal theory,'" *Groden v. City of Dall., Tex.*, 826 F.3d 280, 284-85 (5th Cir. 2016) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988), then quoting *Johnson*, 574 U.S. at 11).

But, to plausibly allege the policymaker prong of *Monell* liability, a complaint must still contain factual content to allow the Court to reasonably infer "that the challenged policy was promulgated or ratified by the city's policymaker." *Id.* at 285; *see also Longoria Next Friend of M.L. v. San Benito Indep. Consol. Sch. Dist.*, 942 F.3d 258, 271 (5th Cir. 2019) ("Because the 'specific identity of the policymaker is a legal question that need not be pled,' plaintiffs can state a claim for municipal liability as long as they plead sufficient facts to allow the court to reasonably infer that the [policymaker] either adopted a policy that caused [their] injury or delegated to a subordinate officer the authority to adopt such a policy. In other words, plaintiffs must plead facts that sufficiently connect the policymaker ... to the allegedly unconstitutional policy." (citing *Groden*, 826 F.3d at 284, 286)).

And, aside from unsupported conclusions, Thompson's complaint fails to connect the individual officers' alleged acts to the City's policymaker. *See, e.g.*, Dkt. No. 16 at ¶ 138 ("Mr. Thompson was merely exercising the rights afforded him by the constitution. Defendants' decision to punish him for these actions was a direct result

- 16 -

of the culture of DPD, City of Dallas, and the Policymakers' lax attitude towards unlawful detentions and investigation offenses."); *id.* ¶ 143 ("Despite these, and many other instances of dishonest behavior, Defendant City of Dallas and its Policymakers still blindly supports DPD officers."); *id.* ¶ 144 ("Given the numerous instances of dishonesty and lack of discipline for dishonest officers, Defendant City of Dallas, through DPD and the policymakers, has demonstrated a policy and/or practice of allowing DPD officers to submit false information in order to secure arrests without the requisite probable cause.").

And, so, because Thompson fails to plausibly allege the first two prongs of *Monell*, the Court need not take up the third – moving-force causation – prong. *See Brown*, 985 F.3d at 497 & n.11; *Zarnow*, 614 F.3d at 168-69.

But, related to the examples immediately above, Thompson's allegations may also be read as an attempt to establish *Monell* liability under a ratification theory – a narrow exception to the requirement that a plaintiff plausibly allege the three required prongs. *See, e.g.*, *id.*, ¶ 137 ("[N]one of the Defendants were [ ] disciplined for their failure to properly investigate, conclude the traffic stop, and not prolong a traffic stop unless they are able to point to specific articulable facts, contrary to DPD's written policy, which demonstrates a ratification of their actions by DPD, City of Dallas, and the Policymakers."); *see also id.*, ¶¶ 138, 141, 143, & 144.

"Concerning ratification, if 'authorized policymakers approve a subordinate's decision and the basis for it, their ratification [is] chargeable to the municipality because their decision is final.'" *Sligh v. City of Conroe, Tex.*, 87 F.4th 290, 303 (5th

Cir. 2023) (per curiam) (quoting *World Wide Street Preachers Fellowship v. Twn. of Columbia*, 591 F.3d 747, 755 (5th Cir. 2009) (quoting, in turn, *Praprotnik*, 485 U.S. at 127)).

But "[s]imply not repudiating [police conduct] does not mean that a policymaker ratifies it. If so, that would cross the line into impermissible respondeat superior liability for a municipality." *Dobbins v. City of Dall.*, No. 3:20-cv-1727-K, 2021 WL 3781927, at *2 (N.D. Tex. Aug. 25, 2021); *see also Peterson*, 588 F.3d at 849 (even "defend[ing] conduct that is later shown to be unlawful does not necessarily incur liability on behalf of the municipality").

Plus, "unless the subordinate's actions are sufficiently extreme – for instance, an obvious violation of clearly established law – a policymaker's ratification or defense of his subordinate's actions is insufficient to establish an official policy or custom." *Sligh*, 87 F.4th at 303 (cleaned up).

And, so, "underlying conduct" that, "while unconstitutional, [may] not [be] sufficiently extreme to qualify for a finding of ratification." *Davidson v. City of Stafford, Tex.*, 848 F.3d 384, 395-96 (5th Cir. 2017) (citing *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985)); *see also Montgomery*, 2019 WL 2424053, at *8 ("[T]he Fifth Circuit has limited the theory of ratification to extreme factual situations, such as officers' killing of the innocent occupant of a truck or their shooting of a fleeing suspect in the back." (cleaned up)).

In sum, the operative complaint contains neither allegations of sufficiently extreme conduct nor allegations that an authorized policymaker approved of – and

therefore ratified – the alleged conduct of the individual officers. Accordingly, Thompson has not plausibly alleged municipal liability under a ratification theory.

## Recommendation

The Court should grant Defendant City of Dallas's motion to dismiss [Dkt. No. 20].

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: September 23, 2024

_____
DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE