IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ERIC DWAYNE THOMPSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | No. 3:23-cv-2056-L |
| | § | |
| CITY OF DALLAS, ET AL., | § | |
| | § | |
| Defendants. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

Through an amended complaint, Plaintiff Eric Dwayne Thompson brings claims under 42 U.S.C. § 1983 for alleged violations of the Constitution against Defendant City of Dallas and three of its police officers, Defendants Ivory R. Dodson, Thomas Guerrero, and Brian J. Hartger (collectively, the "Officers"), based on an August 13, 2021 traffic stop that led to Thompson's arrest (and subsequent charges that were dismissed). *See* Dkt. No. 16.

The Officers responded to the amended complaint by moving for summary judgment on qualified immunity. *See* Dkt. Nos. 21-23 & 26.

One week later, United States District Judge Sam A. Lindsay referred the summary judgment motion to the undersigned United States magistrate judge for hearing, if necessary, and for recommendation under 28 U.S.C. § 636(b). *See* Dkt. No. 25.

And, since then, neither a response nor a reply brief was filed, and the time to do so has expired. *See* N.D. Tex. L. Civ. R. 7.1.

The undersigned now enters these findings of fact, conclusions of law, and recommendation that the Court should grant the motion for summary judgment and dismiss the claims against the Officers with prejudice.

**Legal Standards**

"A plaintiff makes out a § 1983 claim if he 'shows a violation of the Constitution or of federal law, and then shows that the violation was committed by someone acting under color of state law.'" *Rich v. Palko*, 920 F.3d 288, 293-94 (5th Cir. 2019) (cleaned up; quoting *Brown v. Miller*, 519 F.3d 231, 236 (5th Cir. 2008)).

"But government officials performing discretionary duties" can respond to such a claim by asserting qualified immunity. *Rich*, 920 F.3d at 294 (citing *Haverda v. Hays Cnty.*, 723 F.3d 586, 598 (5th Cir. 2013)).

And, if they do, a court must consider each official's actions separately, *see Meadours v. Ermel*, 483 F.3d 417, 421-22 (5th Cir. 2007), on an expedited basis, *see Ramirez v. Guadarrama*, 3 F.4th 129, 133 (5th Cir. 2021), "because qualified immunity is 'not simply immunity from monetary liability' but also 'immunity from having to stand trial,'" *Arnold v. Williams*, 979 F.3d 262, 267 (5th Cir. 2020) (quoting *Westfall v. Luna*, 903 F.3d 534, 542 (5th Cir. 2018)); *see also Kostic v. Tex. A&M Univ. at Commerce*, 11 F. Supp. 3d 699, 711 (N.D. Tex. 2014) ("An affirmative defense may be raised on a motion for summary judgment ... if that motion is the first pleading responsive to the substance of the allegations." (quoting *United States v. Burzynski Cancer Research Inst.*, 819 F.2d 1301, 1307 (5th Cir. 1987))).

"[T]he doctrine of qualified immunity attempts to balance two competing

- 2 -

societal interests: 'the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Joseph v. Bartlett*, 981 F.3d 319, 328 (5th Cir. 2020) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

"These interests are distilled into a legal standard, an affirmative defense, that shields public officials sued in their individual capacities 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Phrased differently, this immunity "attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White v. Pauly*, 580 U.S. 73, 78-79 (2017) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)).

The doctrine therefore "gives government officials breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (per curiam) (cleaned up; quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)); *accord City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015).

"Accordingly, 'qualified immunity represents the norm,' and courts should deny a defendant immunity only in rare circumstances." *Angulo v. Brown*, 978 F.3d 942, 949 (5th Cir. 2020) (quoting *Romero v. City of Grapevine*, 888 F.3d 170, 176 (5th Cir. 2018) (quoting, in turn, *Harlow*, 457 U.S. at 807)); *but see, e.g., Jamison v.*

*McClendon*, 476 F. Supp. 3d 386 (S.D. Miss. 2020) (calling for reconsideration of the doctrine); *Hoggard v. Rhodes*, 141 S. Ct. 2421, 2422 (2021) (Thomas, J., statement respecting denial of cert.) (calling on his colleagues to, "in an appropriate case … reconsider either our one-size-fits-all test or the judicial doctrine of qualified immunity more generally"); *Gonzalez v. Trevino*, 42 F.4th 487, 507 (5th Cir. 2022) (Oldham, J., dissenting) (suggesting that officers who do not make split-second decisions "should not get the same qualified-immunity benefits that cops on the beat might get"), *majority decision vacated & remanded*, 144 S. Ct. 1663 (2024).

The "qualified-immunity inquiry is two-pronged." *Cunningham v. Castloo*, 983 F.3d 185, 190 (5th Cir. 2020) (citing *Garcia v. Blevins*, 957 F.3d 596, 600 (5th Cir. 2020)):

- Do "the facts, viewed in the light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right"? *Id.* at 190-91 (citing *Garcia*, 957 F.3d at 600).

- Was "the right at issue … 'clearly established' at the time of the alleged misconduct"? *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019) (quoting *Pearson*, 555 U.S. at 232).

"In order for a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Ramirez*, 3 F.4th at 133 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

"The reasonableness of the official's conduct and the degree to which the particular right in question was clearly established are thus merged into one issue for purposes of the qualified immunity analysis." *Id.* at 133-34; *cf. Nerio v. Evans*, 974 F.3d 571, 575 (5th Cir. 2020) ("Fair notice requires clearly established law. That is,

the law must 'clearly prohibit the officer's conduct in the particular circumstances before him' so 'every reasonable official' knows not to engage in that conduct." (quoting *D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018); citing *al-Kidd*, 563 U.S. at 742)).

Under this standard, "[q]ualified immunity is justified unless no reasonable officer could have acted as [the defendant officers] did here, or every reasonable officer faced with the same facts would not have [acted as the defendant officers did]." *Tucker v. City of Shreveport*, 998 F.3d 165, 174 (5th Cir. 2021) (quoting *Mason v. Faul*, 929 F.3d 762, 764 (5th Cir. 2019) (internal quotation marks omitted; citing, in turn, *Wesby*, 138 S. Ct. at 590 ("It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. Otherwise, the rule is not one that 'every reasonable official' would know."))).

A court may "analyze the prongs in either order or resolve the case on a single prong." *Cunningham*, 983 F.3d at 191 (quoting *Garcia*, 957 F.3d at 600 (internal quotation marks omitted)).

Even so, addressing this affirmative defense on a motion for summary judgment is not exactly intuitive.

"A plaintiff suing for a constitutional violation has the ultimate burden to show that the defendant violated a constitutional right … whether or not qualified immunity is involved." *Joseph*, 981 F.3d at 329 (footnote omitted).

But, "[w]hen a public official makes 'a good-faith assertion of qualified immunity,' that 'alters the usual summary-judgment burden of proof, shifting it to

the plaintiff to show that the defense is not available.'" *Id.* at 329-30 (quoting *Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016)); *accord Batyukova v. Doege*, 994 F.3d 717, 724 (5th Cir. 2021) ("The defense of qualified immunity 'alters the usual summary judgment burden of proof.' Once a defendant properly raises the defense, the burden shifts to the plaintiff to demonstrate that the defendant is not entitled to the defense's protection." (citations omitted)).

"In other words, to shift the burden to the plaintiff, the public official need not show (as other summary-judgment movants must) an absence of genuine disputes of material fact and entitlement to judgment as a matter of law." *Joseph*, 981 F.3d at 330 (citing *King v. Handorf*, 821 F.3d 650, 653-54 (5th Cir. 2016)).

Once shifted, "the plaintiff bears the burden of demonstrating that a defendant is not entitled to qualified immunity." *Valderas v. City of Lubbock*, 937 F.3d 384, 389 (5th Cir. 2019) (per curiam) (citation omitted).

And, "[t]o rebut [a public official's] qualified immunity defense, [a] [p]laintiff[] must point to summary judgment evidence '(1) that [the official] violated a federal statutory or constitutional right and (2) that the unlawfulness of the conduct was 'clearly established at the time.'" *Cloud v. Stone*, 993 F.3d 379, 383 (5th Cir. 2021) (citations omitted).

And, so, as to the first prong of the qualified-immunity inquiry, to overcome a public official's motion for summary judgment on qualified immunity, the plaintiff "must show that there is a genuine dispute of material fact and that a jury could return a verdict entitling the plaintiff to relief for a constitutional injury" – just as

would be required "if the plaintiff did not face qualified immunity." *Joseph*, 981 F.3d at 330.

That is, the plaintiff must defeat summary judgment by showing that "the facts, viewed in the light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right," *Cunningham*, 983 F.3d at 190-91.

And, when considering this showing, the Court must "accept the plaintiff's version of the facts (to the extent reflected by proper summary judgment evidence) as true." *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 655 (5th Cir. 2004).

Particularly applicable in *pro se* cases, "verified complaint[s] and other verified pleadings serve as competent summary judgment evidence." *Falcon v. Holly*, 480 F. App'x 325, 326 (5th Cir. 2012) (per curiam) (citing *Hart v. Hairston*, 343 F.3d 762, 765 (5th Cir. 2003)); *see, e.g.*, *Mitchell v. Cervantes*, 453 F. App'x 475, 477-78 (5th Cir. 2011) (per curiam).

But if "the [evidence] … offer[ed] in opposition to summary judgment is neither sworn nor declared under penalty of perjury to be true and correct, it is not competent evidence." *Smith v. Palafox*, 728 F. App'x 270, 274 (5th. Cir. 2018) (per curiam) (cleaned up; quoting *Davis v. Fernandez*, 798 F.3d 290, 292 (5th Cir. 2015); citation omitted).

And the Court need not accept "'the plaintiff's version of the facts,'" if "that version 'is blatantly contradicted by the record, so that no reasonable jury could believe it.'" *Joseph*, 981 F.3d at 325 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007);

citing *Orr*, 844 F.3d at 590).

For example, the Court must "assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene," *Newman v. Guedry*, 703 F.3d 757, 761 (5th Cir. 2012) (quoting *Carnaby v. City of Hous.*, 636 F.3d 183, 187 (5th Cir. 2011) (citing, in turn, *Scott*, 550 U.S. 372)).

In sum, "[w]hen one party's description of the facts is discredited by the record, [a court] need not take his word for it but should view 'the facts in the light depicted by the videotape.'" *Id.* (quoting *Scott*, 550 U.S. at 380-81); *accord Joseph*, 981 F.3d at 325 (Where a court "proceed[s] through the facts in detail, including the disputed facts, considering each officer's actions independently," it "draw[s] these facts from the record, prioritizing the video evidence." (footnotes omitted)); *see also Garcia v. Orta*, 47 F.4th 343, 350-51 & n.2 (5th Cir. 2022) (discussing the scope of *Scott*, including that its holding reaches beyond video evidence, to similar items in "the record" "capable of utterly discrediting the plaintiff's version of the facts" – including still photos, taser logs, and "what can be heard, and not just what can be seen, on a video" (citations omitted)); *but cf. Spiller v. Harris Cnty., Tex.*, 113 F.4th 573, 580-81 (5th Cir. 2024) (Willett, J., concurring) ("And while such evidence can sharpen our decision-making by leaving less room for speculation and guesswork, it can often raise as many questions as it answers… And even what the often-harrowing video does show can become a Rorschach test of sorts, as viewers filter objective evidence through subjective experience. Where some see damning digital proof, others see clear-cut exoneration…. As best I can tell, the majority's description is largely faithful

to what the evidence shows in light of the allegations made. But after reading the dissent, one can only wonder how we can reach such polar-opposite conclusions from the same video. [In sum, d]escribing video footage is tricky.").

That's just the first prong: "[T]he plaintiff's version of [the] disputed facts [supported by proper summary judgment evidence and not blatantly contradicted] must also constitute a violation of clearly established law." *Joseph*, 981 F.3d at 330. That is, "when qualified immunity is involved, at least in this circuit, a plaintiff has the additional burden to show that the violated right was 'clearly established' at the time of the alleged violation." *Id.* at 329 (footnote omitted).

And the clearly established question can be "a doozy." *Morrow*, 917 F.3d at 874. That is, "[t]he 'clearly established' prong is difficult to satisfy." *Cunningham*, 983 F.3d at 191; *cf. Cope v. Cogdill*, 3 F.4th 198, 204 (5th Cir. 2021) ("We are bound by the restrictive analysis of 'clearly established' set forth in numerous Supreme Court precedents.").

"In order for a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Ramirez*, 3 F.4th at 133 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

"The reasonableness of the official's conduct and the degree to which the particular right in question was clearly established are thus merged into one issue for purposes of the qualified immunity analysis." *Id.* at 133-34.

And the plaintiff "must show that the law was 'sufficiently clear' at that time

'that every reasonable official would have understood that what he [was] doing violate[d] that right.'" *Batyukova*, 994 F.3d at 726 (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)).

"There are two ways to demonstrate clearly established law" and meet this additional burden to make this second showing. *Id.*

Typically, the plaintiff must "'identify a case' – usually, a 'body of relevant case law' – in which 'an officer acting under similar circumstances was held to have violated the Constitution.'" *Joseph*, 981 F.3d at 330 (cleaned up); *accord Wigginton v. Jones*, 964 F.3d 329, 335 (5th Cir. 2020) (A clearly established right must be supported by "controlling authority – or a 'robust consensus of [cases of] persuasive authority' – that defines the contours of the right in question with a high degree of particularity." (quoting *Morgan v. Swanson*, 659 F.3d 359, 371-72 (5th Cir. 2011))); *see, e.g.*, *Lincoln v. Turner*, 874 F.3d 833, 850 (5th Cir. 2017) ("While we may look to other circuits to find clearly established law, we must consider 'the overall weight' of such authority. A 'trend' alone is just that. As of December 2013, only two circuits had weighed in on the 'contours of the right.' These cases alone do not provide sufficient authority to find that the law was clearly established." (footnote omitted)).

"It is the plaintiff's burden to find a case in her favor that does not define the law at a high level of generality." *Bustillos v. El Paso Cnty. Hosp. Dist.*, 891 F.3d 214, 222 (5th Cir. 2018) (cleaned up; quoting *Vann v. City of Southaven*, 884 F.3d 307, 310 (5th Cir. 2018)). Thus, the "clearly established law" "must be 'particularized' to the facts of the case." *Roque v. Harvel*, 993 F.3d 325, 335 (5th Cir. 2021) (cleaned up). And a clearly established right must be defined "with specificity." *Cunningham*, 983

F.3d at 191 (quoting *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019) (per curiam)).

"The central concept is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Trammell v. Fruge*, 868 F.3d 332, 339 (5th Cir. 2017) (citations omitted).

"In other words, 'there must be adequate authority at a sufficiently high level of specificity to put a reasonable official on notice that his conduct is definitively unlawful.'" *Cunningham*, 983 F.3d at 191 (quoting *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015)).

In sum, under the most common approach to this prong, while the "clearly established right … must be particularized to the facts of the case establishing the right," *Harris v. Clay Cnty., Miss.*, 47 F.4th 271, 277 (5th Cir. 2022) (cleaned up), because "[t]he touchstone of the inquiry is 'fair notice,'" "[d]istinctions between cases are thus relevant only if they make the applicability of prior precedent unclear," *Boyd v. McNamara*, 74 F.4th 662, 669 (5th Cir. 2023) (citations omitted).

That is, "[a] plaintiff need not show that the very action in question has previously been held unlawful. The test is whether every reasonable official would know that their actions are unconstitutional. [And, so, a]t the end of the day, [what is absolutely necessary] is fair warning." *Stevenson v. Tocé*, 113 F.4th 494, 504 (5th Cir. 2024) (cleaned up).

Under the second approach to demonstrating clearly established law, a plaintiff asks the Court to look to "the 'rare' possibility that, in an 'obvious case,' analogous case law 'is not needed' because 'the unlawfulness of the [challenged] conduct is sufficiently clear even though existing precedent does not address similar circumstances.'" *Joseph*, 981 F.3d at 330 (quoting *Wesby*, 583 U.S. at 64); *accord Batyukova*, 994 F.3d at 726.

"[I]n an obvious case, general standards can [therefore] 'clearly establish' the answer, even without a body of relevant case law." *Roque*, 993 F.3d at 335 (cleaned up; quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)).

But "[t]he standard for obviousness is sky high." *Joseph*, 981 F.3d at 338.

And, so, "plaintiffs are only excused of their obligation to identify an analogous case in 'extreme circumstances' where the constitutional violation is 'obvious,'" *Cope*, 3 F.4th at 206 (quoting *Taylor v. Riojas*, 592 U.S. 7, 8-9 (2020) (per curiam)), because qualified immunity should "not immunize those officials who commit novel, but patently 'obvious,' violations of the Constitution," *Tyson v. Sabine*, 42 F.4th 508, 520 (5th Cir. 2022) (quoting *Hope v. Pelzer*, 536 U.S. 730, 745 (2002)); *see, e.g.*, *Harris*, 47 F.4th at 279 ("Detaining Harris for more than six years after he should have been released under Supreme Court precedent and a state court order is a violation of clearly established law. Qualified immunity thus does not protect Huffman and Scott."); *Tyson*, 42 F.3d at 520 ("It is obvious that the right to bodily integrity forbids a law enforcement officer from sexually abusing a person by coercing them to perform nonconsensual physical sex acts for his enjoyment").

## Analysis

The Officers move for summary judgment on qualified immunity in response to Thompson's unverified amended allegations that they violated the Constitution.

Accordingly, as set out above, to defeat qualified immunity, Thompson must come forward with evidence to support his best version of the disputed facts not otherwise blatantly contradicted by the record that constitutes a violation of clearly established law.

This burden is difficult to satisfy where Thompson failed to respond to a motion for summary judgment on qualified immunity supported by evidence including the Officers' declarations and footage of the traffic stop and arrest from body-worn cameras.

But the Court must review the record evidence in the light most favorable to Thompson to determine whether there was an *obvious* violation of clearly established federal law, considering that Thompson, by not responding to the summary judgment motion, fails to present the Court with relevant case law particularized to the facts here – and thus has done nothing, on his own, to defeat qualified immunity's clearly established prong.

And, for the following reasons, because Thompson has not met his burden to overcome each assertion of qualified immunity by the Officers, the Court should grant the motion for summary judgment and dismiss the claims against them with prejudice.

Thompson's various Section 1983 claims – unlawful arrest and prosecution

through the wrongful institution of legal process; unlawful seizure and arrest of a person; malicious criminal prosecution; violation of procedural due process for filing a false report (against just Officer Dodson); and failure to supervise (against just Officer Hartger) – are rooted in his contentions that the Officers "knew or should have known that they did not have probable cause to arrest [him] on the charge of failure to identify fugitive from justice"; that the Officers "conducted a reckless and unlawful prolonged traffic stop investigation"; that the Officers "knowingly included false statements and material omissions in the incident report used to justify [his] arrest"; and that, "[a]bsent this misconduct, the arrest and subsequent prosecution of [Thompson] could not and would not have been pursued." Dkt. No. 16, ¶¶ 151 & 152; *see also, e.g.*, *id.*, ¶¶ 165, 170, 175, 187, & 203-07.

Thompson's unverified allegations are not evidence. And the Court must consider whether a clearly established constitutional violations occurred based on just the evidence before it, including the videos. But the Court should still consider "what the evidence shows in light of the allegations made," *Spiller*, 113 F.4th at 581 (Willett, J., concurring), to the extent that – to determine whether any "conduct violat[ed] a constitutional right" – the account of the incident supported by the evidence must be "viewed in the light most favorable to" Thompson, as "the party asserting the injury," *Cunningham*, 983 F.3d at 190-91.

To start, Thompson does not contend that the initial traffic stop was itself unconstitutional. And, according to Officer Guerrero,

> [d]uring the traffic stop, I attempted to identify Eric Thompson. Eric
> Thompson refused to give me his name. In my training and experience,

when citizens become immediately apprehensive and defensive in giving an officer his name, it usually means they are attempting to hide something that may or may not get them in trouble, such as a warrant.

During the course of the traffic stop I observed a work Identification card on a lanyard hanging from the rear view mirror with the name Eric Thompson, and a photo matching the description of the passenger, Eric Thompson. I wrote the name on my "whip out pad" and handed it to Officer Dodson to perform a search of the name for any potential suspect hits or warrants.

I don't believe I overstepped any boundary in asking Eric Thompson for his name multiple times. Eric Thompson stated himself I did not overstep in asking.

Officer Dodson returned and let me know Eric Thompson had active warrants for his arrest so we placed Eric Thompson under arrest. Eric Thompson asked for a supervisor so my direct Sargent, Brian Hartger, came and spoke with Eric Thompson before transporting Eric Thompson to jail.

The arrest was without further incident.

Dkt. No. 23 at 14-15.

Officer Dodson's version of events is more detailed but not inconsistent with

Officer Guerrero's:

On August 13, 2021, at approximately 11:37 am, I conducted a traffic stop of a silver 2004 Ford sedan displaying Texas license plate MLC7245 that made an improper wide right turn and had expired registration. The Ford made an improper wide right turn as it went from north bound 4200 Independence Drive, and turned right, and immediately went into the far-left lane of west bound 4200 West Camp Wisdom Road. As the vehicle pulled into off of the roadway and into a parking lot, I observed a lot of motion from the front passenger. Based on my training and experience with traffic stops I believed the motion consistent with someone reaching to conceal or retrieve an unknown object. I warned my partner that there was a lot of movement from the front passage. I approached the vehicle and made contact with the driver of the vehicle, Ms. Kendra James, and spoke to her about the reasons for the traffic stop. I observed the front passenger stretched out with his but low in the seat, legs stretched out in front of him, but pushed up towards the glovebox in a manner that I have previously observed from people attempting to hide objects that they have concealed on the floorboard. The position looked uncomfortable. Usually when I observe behavior like that on traffic stops, it is followed by the vehicle fleeing so I visually check for signs that it is still shifted in drive. I observed that

the gear shift display had the "D" symbol displayed on the information panel near the odometer and asked the driver of the vehicle to put the car into park. Both occupants of the vehicle stated the car was already in park, even though Mr. Thompson had to manipulate the shifter and the car rocked back and forth as it was placed in park.

While I was talking to the driver about the expired registration the other occupant of the vehicle, Mr. Eric Thompson interrupted and answered the questions. Mr. Thompson leaned across to speak with me about the situation with the vehicle and indicated that he was the owner. When I asked why the registration had not been updated Mr. Thompson stated that the issue was money. Mr. Thompson was holding papers in his hands and passed them over to me. Mr. Thompson went back to leaning back in his seat and stretching his legs out in front of him and across the glovebox. I examined the papers to see if they were for proof of financial responsibility (insurance). The ink printed on the papers was so light in color that I had difficulty reading the document and could not make out the words. While I was attempting to review the papers and speaking with the driver, I could hear my partner and Mr. Thompson arguing. Ms. James whispered and mouthed some comments, but I could not make them all out over the arguing. It sounded like she whispered, "he got warrants." I asked what was going and if everything was okay. Ms. James stopped talking. I tried to answer some of the questions about the detention and Mr. Thompson remained argumentative. Mr. Thompson stated that he did not know anything about the car and that he did not want to talk about the car. Earlier Mr. Thompson had made statements about being the owner of the car and knowing about the registration and insurance situation. Ms. James asked questions about the reason for the traffic stop and I explained that the registration was expired, and that Ms. James made an improper wide right turn. I asked Ms. James what was going on with Mr. Thompson and what his name was. Ms. James stated she said she did not know; she stated that she gave her information already and did what she needed to do.

I observed a woman across the street who was not related to our traffic stop yelling and throwing items in a manner that I recognized as someone experiencing some type of psychosis. I tried to signal to my partner to keep an eye out for the unknown woman because she kept stepping in and out of traffic while yelling. Due to the situation with the unknown woman and Mr. Thompson being argumentative, I requested a cover element (additional officers) over the radio. I also conducted a subject check on the Ms. James's name and date of birth from the Texas drivers license she provided me over the radio. I glanced through the rear windows several times to make sure there was not a firearm visible. Mr. Thompson's willingness to answer questions, then abruptly saying

he did not want to answer questions even though he had already indicated he was the owner of the vehicle was consistent with my previous experience with wanted persons who possessed firearms and stolen vehicles. My partner told me that Mr. Thompson requested a supervisor. Due to the busy radio traffic from other officers, I decided to conduct the subject check and call for a supervisor in the squad car. As I was walking over to the squad car my partner waived at me. I walked over and my partner handed me his whip-out note pad with a male name written on the top page. I saw the name written and asked my partner where it was from. My partner said the name "Eric Thompson" and pointed to where a card on a lanyard had been previously hanging.

My cover element (Officer D. Rodriguez and Officer T. Forest) arrived at some point while I was doing the subject checks. I gave the cover elements a brief summary of the traffic stop. I warned the additional Officers that Mr. Thompson may have active warrants and he had concealed a work badge that was in plain view in the car. I also informed the other Officers that we were waiting on a supervisor to arrive at the scene per Mr. Thompson's request.

Using the squad car computer, I conducted a check of Dallas County Jail records and observed an arrest profile for Mr. Thompson (AIS # 2356382) that had a matching photograph. I conducted an NCIC/TCIC subject check of the name and date of birth from the jail record and observed multiple active warrant hits for Mr. Thompson out of the City of Dallas. I conducted a subject check of Ms. James, and it came back clear with no hits and a valid drivers license. I observed that the last four digits of the VIN that I observed on the vehicle through the windshield, matched the registration check return that we got when the traffic stop was initiated. The initial registration checks also came back with an unconfirmed (no valid) insurance return. I used my city issued cell phone to take a picture of the Texas identification card image in the subject check return for Mr. Thompson. I walked back up to the car to compare the picture and verify that Mr. Thompson was the wanted person on the warrant hit.

Knowing that Mr. Thompson had active warrants and argumentative individuals on traffic stops tend to resist arrest or flee, I requested that Mr. Thompson exit the vehicle. It is commonplace in law enforcement, more specifically the Dallas Police Department to inform individuals that they are under arrest and why they are under arrest after they have safely been placed in handcuffs to prevent injury from a combative individual. I requested that Mr. Thompson exit the vehicle and my partner opened the front right passenger door. At that time Mr. Thompson began leaning back even further down into his seat and moved his right arm down from where it was holding onto the "B pilar" part of the car frame behind him. I quickly grabbed Mr. Thompson's

right arm to prevent it from moving down behind him in case there was a firearm or other weapon concealed on the floorboard of the car. My partner and I grabbed Mr. Thompsons arms and guided him out of the vehicle. Mr. Thompson did not pull away or resist the handcuffing. Once Mr. Thompson was safely secured in handcuffs, I informed Mr. Thompson that he was being arrested for active warrants. Mr. Thompson made statements about the warrants just being tickets and knowing they were active since 2012. I conducted a custodial search of Mr. Thompson incident to arrest and did not locate a firearm or other contraband. Mr. Thompson requested that Ms. James be given all of the property located on his person.

*Id.* at 19-21.

The undersigned's review of the "video recordings taken at the scene" reveals that the "facts evident" from the recordings, *Newman*, 703 F.3d at 761, do not blatantly contradict – and instead are consistent with – the accounts set out by the Officers' testimony.

And, so, to determine whether an obvious violation of clearly established federal law is shown by this evidence, the undersigned first considers the account of the incident supported by the evidence under the Fourth Amendment standards applicable to a traffic stop.

"The Fourth Amendment prohibits unreasonable searches and seizures." *United States v. Wright*, 57 F.4th 524, 530 (5th Cir. 2023) (citations omitted).

And, "[w]hen the police stop a vehicle and detain the occupants, they have effected a Fourth Amendment 'seizure'" that is commonly called a *Terry* stop. *Johnson v. Thibodeaux City*, 887 F.3d 726, 733 (5th Cir. 2018) (citing *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc)); *see also Wright*, 57 F.4th at 530 ("A *Terry* stop is a special category of Fourth Amendment seizures, in which an officer may briefly detain an individual for further investigation, if the officer has

- 18 -

reasonable suspicion the individual is engaged in criminal activity." (cleaned up; citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968); *Dunaway v. New York*, 442 U.S. 200, 210 (1979))).

To "review the legality" of *Terry* stops, courts "first examine whether the officer's action was justified at its inception and then inquire whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *United States v. Henry*, 37 F.4th 173, 176 (5th Cir. 2022) (per curiam) (citing *Brigham*, 382 F.3d at 506).

"The 'touchstone of the Fourth Amendment is reasonableness,' and reasonableness is measured 'in objective terms by examining the totality of the circumstances .... eschew[ing] bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry.'" *United States v. Del Angel*, No. 20-20258, 2022 WL 1549479 (5th Cir. May 17, 2022) (per curiam) (quoting *Florida v. Jimeno*, 500 U.S. 248, 250 (1991); *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)).

"Reasonableness requires a balancing of the public interest with an individual's right to be free from arbitrary intrusions by law enforcement," while "courts must allow officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Henry*, 37 F.4th at 176-77 (cleaned up); *see also United States v. Aguilar*, DR-07-CR-844(1),(2)-AML, 2008 WL 11357945, at *5 (W.D. Tex. Oct. 29, 2008) ("It is generally reasonable for a police officer to stop a vehicle when there is probable cause that a traffic violation has

occurred." (citing *Delaware v. Prouse*, 440 U.S. 648, 659 (1979))).

While the reasonableness of the initial stop is not contested, the evidence also supports that it was reasonable to make the stop based at least on a traffic violation: the improper wide right turn. *See* TEX. TRANSP. CODE § 545.101(a) ("To make a right turn at an intersection, an operator shall make both the approach and the turn as closely as practicable to the right-hand curb or edge of the roadway."); *United States v. Onyeri*, 996 F.3d 274, 279 (5th Cir. 2021) (The officer's "observation of this traffic violation" – "an improper turn 'into the number one lane' in violation of Texas Transportation Code § 545.101" – "gave him an objectively grounded legal justification – and sufficient probable cause – to initiate the stop." (citation omitted)).

And the Officers' "subsequent actions were reasonably related in scope to the circumstances." *Henry*, 37 F.4th at 176; *see Johnson*, 887 F.3d at 734 ("[A]n officer's actions after a legitimate stop [must] be 'reasonably related to the circumstances that justified the stop, or to dispel[ ] his reasonable suspicion [that] developed during the stop.' [And a] reasonable detention 'must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges.'" (quoting *Brigham*, 382 F.3d at 507)).

"There is no constitutional impediment to a law enforcement officer's request to examine a driver's license during a traffic stop and run a computer check." *Henry*, 37 F.4th at 176 (footnote omitted). "An officer may also seek to identify and run computer checks on passengers." *United States v. Alvarez*, 837 F. App'x 296, 299 (5th Cir. 2020) (per curiam) (citing *United States v. Pack*, 612 F.3d 341, 350-51 (5th Cir.

2010)). And, "[i]f the officer develops reasonable suspicion" – "a low threshold," "requir[ing] only some minimal level of objective justification" – "of additional criminal activity during his investigation of the circumstances that originally caused the stop, he may further detain the vehicle's occupants for a reasonable time while appropriately attempting to dispel this reasonable suspicion." *Id.* (quoting *Pack*, 612 F.3d at 350).

As to the Officers' obtaining Thompson's name from his work badge, to run a computer check on him, if the copying down of Thompson's name counts as a seizure under the Fourth Amendment, *see, e.g.*, *LeClair v. Hart*, 800 F.2d 692, 695 (7th Cir. 1986) (collecting cases), the badge was in plain view during a justified and otherwise reasonable *Terry* stop, and Thompson's evasiveness triggered a reasonable suspicion to investigate further, *cf. United States v. Marbury*, 732 F.2d 390, 399-400 (5th Cir. 1984) ("[W]hile searching the property for certain items of stolen property, by authority of a duly issued search warrant, [the officer] noticed that the equipment so observed fit the description of items which had been reported as stolen, copied down the identification numbers, and, through these numbers, subsequently confirmed his hunch that the equipment was stolen. The evidence at the suppression hearing does not establish that the officers had to use particularly intrusive means to retrieve the numbers, or that they came across the two items of equipment named in the May 7 affidavit other than while these two items were in the open and in the officers' plain view during their execution of the May 6 warrant." (cleaned up)).

And, so, Thompson has not shown an obvious violation of clearly established

federal law based on the *Terry* stop or the Officers' subsequent actions, as it was reasonable (1) to request that he identify himself and (2) to run the computer check based on a name obtained from a badge in plain sight. And Thompson's behavior gave rise to a reasonable suspicion to investigate further, to dispel a belief that he was attempting to conceal his identity from officers to, for instance, avoid arrest.

Next, to the extent that Thompson grounds a Fourth Amendment violation on a theory of malicious prosecution, a required element of such a claim is "the absence of probable cause for [the resulting criminal] proceeding." *Armstrong v. Ashley*, 60 F.4th 262, 279 (5th Cir. 2023) (quoting *Gordy v. Burns*, 294 F.3d 722, 727 (5th Cir. 2002)); *see id.* at 279 n.15 ("Importantly, because an unlawful seizure is the threshold element, if the prosecution is supported by probable cause on at least one charge, then a malicious prosecution claim cannot move forward." (citing *Thompson v. Clark*, 596 U.S. 36, 43 n.2 (2022))). And Thompson was subsequently prosecuted for, among other charges, outstanding warrants, something that he does not dispute (and which is supported by the uncontested evidence set out above).

Thompson also has not demonstrated an obvious violation of clearly established federal law based on a theory of supervisory liability against Officer Hartger, who was not personally involved with the traffic stop and arrived on the scene after Thompson's arrest had been initiated – and who is "not vicariously liable for the conduct of those under [his] supervision." *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 420 (5th Cir. 2017) (per curiam) (citing *Mouille v. City of Live Oak*, 977 F.2d 924, 929 (5th Cir. 1992)).

Instead, "[s]upervisory officials are accountable for their own acts of deliberate indifference and for implementing unconstitutional policies that causally result in injury to the plaintiff," *id.* (citation omitted), and the evidence does not support a finding of either, *see* Dkt. No. 23 at 17 ("When I arrived at the location Mr. Thompson was being arrested. Officer Dodson gave me a synopsis describing that they had made the stop for the expired registration. During the stop they observed what appeared to be a work identification card of Mr. Thompson handing from the rear view mirror in plain view with his name on it visible to them from outside the car. When officers mentioned the registration violation, Mr. Thompson said he was the owner of the vehicle and that prompted them to ask for his name to see if he was the registered owner or if the vehicle had never had the registration transferred to him. Him claiming to be the owner and refusing to give his name is part of what caused them to be suspicious of him. After Mr. Thompson asked for a supervisor to come to the scene but before I arrived was when Officer Dodson ran his name and was alerted to the warrant for his arrest. I then talked to Mr. Thompson while he was in the back of the squad car. I listened to Mr. Thompson's concerns and explained to him the situation. Officers Dodson and Guerrero then transported Mr. Thompson to jail.").

And, for the reasons persuasively set out in the Officers' summary judgment brief, *see* Dkt. No. 22 at 48-52, Thompson has not demonstrated an obvious violation of clearly established federal law as to an alleged procedural due process violation against Officer Dodson related to an allegedly false report.

First, no evidence seems to support Thompson's alleged violation. And, if

evidence did, Thompson has not carried his burden as to qualified immunity's clearly established prong to the extent that he relies on "*Cole v. Carson*, 802 F.3d 752 (5th Cir. 2015), *vacated on other grounds sub nom., Hunter v. Cole*, 137 S. Ct. 497 (2016)." Dkt. No. 16, ¶ 175.

*Cole* "recognized a substantive due process right 'not to have police deliberately fabricate evidence and use it to frame and bring false charges against a person.'" *Traylor v. Yorka*, No. 22-10783, 2024 WL 209444, at *4 (5th Cir. Jan. 19, 2024) (per curiam) (citation and footnote omitted).

> In *Cole*, three officers pursued the plaintiff and subsequently opened fire. After the shooting, the officers had time to confer before giving their statements, and they ultimately claimed that the plaintiff was given a prior warning and pointed his gun towards one of the officers. Indeed, *Cole* involved allegations of a conspiracy and the calculated fabrication of evidence to justify a shooting. This false evidence led to a felony charge for aggravated assault on a public servant, which in turn caused significant reputational injuries and legal expenses.

*Id.* at *5 (citations and footnotes omitted).

Just as in *Traylor*, "[t]he facts of *Cole* are distinguishable from those presented here." *Id.* And, so, "*Cole* did not clearly establish that 'every reasonable official' in [Dodson's] position would have understood that his conduct violated [Thompson's] Fourteenth Amendment right." *Id.*; *Roque*, 993 F.3d at 335 (the "clearly established law" "must be 'particularized' to the facts of the case").

## Recommendation

The Court should grant Defendants Ivory R. Dodson, Thomas Guerrero, and Brian J. Hartger's motion for summary judgment on qualified immunity [Dkt. No. 21] and dismiss the claims against them with prejudice.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: September 24, 2024

_____

DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE